**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK: BROOKLYN**
**------------------------------------------------------------------X**

**David T. Atkins, Anthony A. Abbazio, P.V. Abraham, Donald and Barbara K. Abram, Barbara S. Accetta, Martin F. and Martha Achilles, Lowell Ackiron, M.D., Alissa Adamo, Jerry L. Adams, Nina Adams, Sandra S. Adler, Abbie Akst, Hymie Akst, Barbara L. Albright, V. Marilyn Alexander, H. Craig Allen, Larry E. Allen, Dorothy M. Altman, Paul H. Altrocchi, Rosemarie and Fred Amato, Eugene R. Andersen, Jan Arden, Edna C. and Harold J. Arnold, Frances Bachman, Vernon Bailey, James A. Baker, Evelyn Balan, Nancy C. and Richard P. Balcer, Barbara E. Baldwin, David L. Ballard, Victor N. Barbanell, Earl E. Barber, Jr., Paul R. Barbey, Norman Bard, Donald W. Barnak, Kenneth L. and Joyce F. Barndt, Miriam and Irving Barr, Ernest Barrasso, John and Angela Barulich, David T. Beauchamp, M.D., Diane L. and Gerald Becker, Stanley R. Becker, Carole A. and Paul Behrmann, Norberto Belleza, Joseph L. Belsky, Alan J. Bender, Ray Benfield, Joanne Marritt and Roy Benjamin, Robert C. Benjamin, Eugene F. Bereczky, Al Berg, Lloyd F. Beriault, Eileen Berke, Irving Berkowitz, Genia Berman, Richard Berman, Peter K. Bertine, Leonard Bickman, Ray C. Bissell, Jr., John A. Blauvelt, Edward C. Bloom, Eva Jean Blount, Flora Blumenthal, Barbara Bobbin, John E. Bocker, W. Dale Bombard, James Bomberger, Barbara Boor, Erla Borkowski, William Borkowski, Harold D. and Maureen L. Bornstein, Carol Boruk-LaRue, Richard Bosco, Roger Bower, Reverend Paul W. and Audrey E. Bowles, Joyce L. and Lawrence M. Boyce, Marie M. Boyd, Charles Bradford, Kenneth A. and N. Jeanette Bradley, James and Anita Brady, Stephen M. Bragin, Charlotte B. Brasel, Thomas Brazaitis, Don E. Brazeal, Marcus N. and Sondra K. Bressler, Joan R. and Russell W. Bretz, Jr., John A. and Peggy Lou Bridance, Jonathan D. Brodie, M.D., David Brown, Diana Kay Brown, Jeffrey I. Brown, Kenneth Brown, Mark Brown, Michele D. Brown-Lavy, O.L. Brumfield, Roger Bryden, Carroll K. Burgess, Sylvia H. Burgess, Patricia M. Burke, David F. Burr, Thomas and**

**DOCKET NO.: 05 CV 4365**

**FIRST AMENDED COMPLAINT**

SIFTON, J.

POLLAK, M.J.

**Deirdre C. Burton, Thomas and Margaret Burton, Edmond A. and June Bushey, Michael E. Bushey, William E. Byczek, Louis A. Camp, Patricia J. and Michael A. Campanelli, Kevin Campbell, Wayne and Jeannette Campbell, George J. Cappiello, Eugene Cardoza, Nancy A. and William J. Carey, David and Cindy J. Carlton, George J. Carr, Ralph E. Cascarilla, Francine Cashel, Alfred Cassandro, John Cassandro, Robert Cassandro, Robert A. Castille, Thomas Michael Castle, Steven A. Casuto, Anthony J. and Catherine L. Catanese, Jr., Robert Cathey, Virginia Caudill, Barbara and Robert Cerwin, Robert Cesaria, Brian Chait, Jeremy S. Chapman, Mildred and Louis Chaykin, Scott Chaykin, Estelle C. and David D. Chernow, Dhan Keshar Chettri, Susan Chiafullo, Warren Chisum, Amanullah Chowdhury, Lutful H. Chowdhury, Dominick V. Cianciotti, Jack J. Cinque, Fulton V. Clark, Jr., Eleanor Clift, Joseph Coan, Geoffrey S. Coates, Ann Marie Cobb, Albert and Andree Cohen, Donald L. Cohen, Irving Cohen, Jacky Cohen, Muriel Cohen, Phyllis J. Cohen, Seymour and Sandra Cohn, Stuart A. Cohn, Dolores Collins-Gordon, Erlene Colvin, John P. Comparato, Richard J. Constantine, Norma and Michael Contos, Kelly Anne and Scott M. Convery, Verone H. Cook, Douglas R. Cooley, John C. Cooper, Adrian R. and Eleanor Coren, M.D., Joseph M. Costello, Jimmy G. Covington, Roslyn L. and Irving M. Cowle, Fred Wallace Cox, William Crede, William J. and Kristine Crockett, Charles Vaughn Dagenhart, Anthony C. and Marilyn Dalessio, Gregory R. Dalton, Alphonso T. and Barbara A. Dampog, Peter A. and Angie P. Danna, Richard Danzansky, Radhika Daryanani, John Davidson, Michael Davies, Harry R. Davis, Melvyn J. Davis, Deanna DeCherney, Reynold T. Decou, Sharon and Dana R. Deem, Ruth R. DeFoe, Charles W. Dein, Charles J. DeLancey, Eugene W. Dencker, David and Patricia M. Denison, Barry and Earl B. Denman, Joseph R. DeOliveira, Georgette Deroche, John De Rosa, Shirley F. Deteau, Gustave F. DeVelasco, Gustavo DeVelasco, Joseph F. DeVelasco, Marta DeVelasco, Judith Davies DeVries, Joseph Dinolfo, Irma and Raymond Diorio, John M. and Sherri M. Donaldson, Paul Dondlinger, Walter L. and Jean**

**Dost, L. Robert Duffy, Virginia Duffy, Doris R. Dworkin, Elliot Dworkin, John and Maria Dwyer, Cheryl Moyer Dillman Trust, Susan Eddy, Sandra Edmonds, Michael and Kay Eiseman, Mark C. Engasser, M.D., Rudolph M. and Mary Erb, Alan S. Exler, Michael Exler, Pam Exler, Ryan Exler, Todd Exler, Alan Farber, David I. and Cindy Farber, Dina Farber, Philip Farber, Norman W. and Barbara Fecio, Robert S. Feldman, M.D., Marvin E. Ferguson, Robert G. Ferguson, Jr., Ralph Fernandez, Thomas Ferrara, Louis A. Ferraresi, Jr., John Field, Jean E. Findlay, Ronald Finger, Mani Finger, Tamara Finger, David S. Fischel, Stuart Fisher, John and Patti Flaharty, Johnie and Robena Flakes, Sidney Fleisher, Harold R. and Jayne Flicker, Edward Fornasar, Mary Ellen Fornsel, John Fote, Kathleen M. Foust, Deborah A. Fox, Robert P. Fox, Clyde D. Frank, Edward M. Frankel, Keith Frankel, Eugene J. and Rosemary Friedman, Lawrence J. Friedman, Jeanne and Lester Gaither, Armando Galindo, Robert C. Ganss, Ramona Garcia, Robert Garcia, Jorge L. Gardyn, M.D., Joanna Gemmell, Melvin Y. Gershman, Mary Martha Gibson, Eloise K. and Charles H. Gilliland, Stephen T. Gillingham, Ina Faye Gillispie, Wayne M. and Lois Gilmore, Arthur and Lois Ginsberg, George and Evangeline Giordano, Irwin R. Gitlin, Sanford Glantz, M.D., Mark H. Glasser, M.D., Anita and Allan E. Glickman, Bernard Glintz, Paul and Adele Godofsky, Stephen Godofsky, N. Nadine Godwin, Norman Goldberg, David L. Goldrich, Samuel Goldstein, Jimmy Goode, Eugene Goodman, Abraham and Hada Gordon, Ofra Gordon, Shaike Gordon, Judith S. Gottesman, Krishan K. Goyle, Anne C. Grant, Rickey and Hilton Gray, Victor H. and Gloria S. Graymez, Cynthia Green, Melvin R. Green, Michael G. Green, Sheryl Green, Lorraine R. Greenberg, Robert Greenberger, Richard Greene, Jane Taylor and Bruce T. Greenfield, John A. and Anita L. Gregory, James Grifo, Robert Gronquist, Laura A. Gross, Zhulin Guan, Joseph Guido, Jack Gun, Don and Helaine Gustin, Mark J. and Marianne E. Haag, R. Bonnie Haber, Muriel Haber, Theodore Haber, Audrey Hanna, Robert and Linda G. Hanna, Frances M. Hansen, G. Spencer and Peggy P. Harden, Lloyd Harris, Alan Hartzmark,**

**Dolores Hartzmark, Michael Hartzmark, Jane F. Harvey, Melissa Hassell, Madeleine Hassett, David G. Hast, Bruce Hausman, Ronald H. Hayward, George M. Hedden, Marian Heiser, Arlene S. and William E. Heitz, Linda-Ann Heldt, Ronald A. Hellstern, M.D., Grant T. Helmendach, Constance and Richard Herodes, Herbert H. and Pamela R. Hertner, Lea Herzog, Michael Herzog, George Hilderbrand, Dawn Hillstrom, Gregory H. Hinton, Keith E. Hlad, Susan Hochberg, Dorothy G. Hoefer, Avi Hoffman, Mark and Debra Hoffman, Oren Hoffman, Rachel Hoffman, James J. Holden, Stanley W. Hollenbeck, Jr., Robert W. Holtz, William Holtzman, Michael A. and Gail L. Holub, Irving Horowitz, Charlotte S. Hosie, Charles A. Howard, John Hulyo, Thomas P. Hyland, Roy J. Ickes, Carlos Iglesias, M.D., Anthony C. and Giovanna Isaacs, Viola P. and James D. Isbell, Primitiva Isona, Yossi and Martha Israeli, Michael B. Jackson, Debra Jacobs, Karen and Fred Jacobs, Elaine Jacobson, Robert Jacobson, Rochelle Jacobson, Benjamin Jagendorf, M.D., Nirmal K. Jain, D.D.S., Ramchandra and Rashmi Jakhotia, Emma Jauch, Joy B. Jelinek, Annie Jenkins, W. Thomas Jenkins, M.D., Warren H. Jensen, Priscilla H. and William A. Johnson, Judith Ann Johnston, Martin and Bridget Joyce, Richard Kaczmarek, Walter J. Kalewski, Jack Kanz, Judith Kanzic-Philipbar, Patricia Kaplan, Moreson Kaplan, M.D., Tina A. Kart, Alan Katz, Stanley Katz, Sidney and Shirley Katz, Joan B. Kaye, Peter Kelman, Robert E. Kemp, Cyvia and Ary Kempler, Edmund C. Kendall, Arthur and Natalie Kessler, Jane R. and John C. Kiick, Jr., Thomas Killip, Norman King, Thomas King, Murray Klein, Ferd L. Klobucar, Robert and Beulah Knieriem, Alois L. Kodet, Marvin Kogod, Leo Kohl, Stjepa Kolovic, Zefa and Lena Kolovic, Jack Korn, Donnie G. Koym, Doris and Julius Kramer, James Krantz, John Kranz, Jerrold Kriegel, Devikarani Krishnaraj, Robert T. Kroepel, D.D.S., Ruth and Clinton Kuhns, Caroline Kunkel, Mark Kunkel, Terry A. and Kathleen A. Kurth, Carmen LaBianca, Rocco J. and Arlene C. Labozetta, Carole and Clern LaFountaine, Robert C. Lagerstrom, Barbara Lamborghini, Robert N. Lando, Geneva W. Lannen, Robert C. and Kathy A. LaRose, Larry U.**

**Larson, Alvin I. Lebensfeld, Victor Lederman, Sandra Lehman, Howard H. Lehr, M.D., Walter W. and Mary A. Lenz, William Leone, Maurice G. and Marcia D. Levine, Millicent Levine, Ruth and Albert Levine, Stewart and Laura Levitan, Charles Levy, Andrew and Edith Lichtman, Rudolph and Helen Lidsky, Gary Lieberman, Lawrence Lieberman, Robert R. and Lucille P. Liggitt, John C. and Katherine Lightfoot, David R. and Patricia E. Lillard, Fran Liner Kupferman, Danny Locklear, Jim and Melodye Locklear, Linda R. Loll, Homer and Betty J. Lowe, Simon Lowy, Michael Lucci, Robert A. Luciano, Marlene R. Luffman, Lawrence and Karen Lukenda, Djordja and Mitar Lukic, J.C. and Gussie W. Lumsden, Jr., James W. Lunan, M.D., Ida Lund, David W. Lundahl, Edward Lundgren, Paula J. Lynch, Janet F. Lyon, Kathryn Lyons, Nancy and Sally MacArthur, Lucille K. Madri, Patrick J. Magee, Roberta and Charles F. Maguire, Ashwin Mahajan, Bhakti Mahajan, Damodar Mahajan, Gita Mahajan, Manorama Mahajan, Rohini Mahajan, Sarvesh Mahajan, Shyam S. Mahajan, Veena Mahtani, William Louis Maier, Vincent Mallardi, Gloria M. Malone, Frank Mancini, John J. Mangini, Joseph Mangione, Joseph R. and June Mariano, John A. Martens, Corinne Martin, Fritzie Martin, Richard D. Martin, M.D., Frank Martorana, Marianne B. Marvan, Charles S. Marwick, Mae E. Mastandrea, George and Lourdes Mathew, Perry Dale Mathis, Janice Matthews, Henry M. and Adrianne Mautner, Ann S. Maxwell, Richard L. Maxwell, Kathy A. and Bruce M. May, Harold F. Mayer, Patricia McEntee-McFadden, Patricia McGetrick, Leana McKenrick, Bonnie E. McKibbin, Daniel J. Melker, Craig H. Melter, Robert Memler, Linda D. and John R. Mendell, Richard Merrell, Beno Michel, M.D., Charles Milano, John Milano, Mary Milano, Peter Milano, deceased, Barry Miller, Delbert and Lavonne Miller, Frederick M. Miller, Julia Miller, Kent G. Miller, M.D., Lee W. Miller, Sam Millman, Cherie Mintz, Louis Mintz, Stephen Mintz, Pirkash Mirchandani, Alexander J. and Nancy F. Mitchell, John W. Moffitt, George A. Moline, K. William Mopper, Robert R. Morgan, Albert R. Morris, Henry J. and**

**Katie Morris, Nancy J. Morris, Richard Morris, Richard E. Morse, Thomas F. and Suzanne Morton, George N. Munro, Louise C. Munster, Dominick Musich, Robert Musich, Roger Musich, Debra and Christopher Muzzin, Joel Nadel, Grace and Stanley Nahigian, Charles Nail, James Nail, William F. Nail, Jr., Robert M. and Lee Naiman, Johnson and Mary D. Nathan, Howard Nathanson, Richard Nattis, Janet L. Nazif, Jack Needham, Ronald and Victoria Neill, John D. Nelson, Amen Ness, James B. Newman, Edna M. Norton, John and Theresa Noschese, Marcia Novack, Jeffery Novotny, Sr., James O'Donnell, Charles and Annetta Oestreicher, Carol Olivieri, Heather Olson, Richard J. and Mary J. Olson, Eric J. Olving, Lawrence Orilia, Osvaldo Orologio, Angeline Orr, John Orr, Imogene B. Osborne, Marvin Ostrow, Stacia Ostrow, John Ostuni, Thomas Ostuni, Charles Ostuni, Robert D. Ottmann, Lawrence J. Pacernick, Rosarie Pagliocca, Larry H. Pallini, Luciano Palmieri, Luigi Palmieri, Vittorio Palmieri, Marilyn Pandorf, Anthony Paolercio, George B. Pappa, William P. and Linda A. Pappa, Vincent Parziale, John G. Passarelli, M.D., Bhupendra R. Patel, Mangubhai G. and Parvati Patel, M.D., Mary Patel, Howard Patron, Daniel Paul, Pia G. Pavlowich, Joan M. Pawlus, Phillip E. Pendley, Richard T. Pennoyer, Russell Pergament, Jean and J.R. Perkins, Cynthia and James M. Persky, Paige Elizabeth Persky, Rachel Suzanne Persky, Zachary Connor Persky, Robert H. Petrocelli, Jr., Janet R. Petruno, Daniel L. Petry, Vincent M. Pharao, Douglas R. Phillips, M.D., Gary Phipps, Ralph L. Pickard, Peter Picone, Harry E. Pinkerton, III, Paul Pirozzi, Edwardo and Adela Pita, David Podell, Joyce Polster, Joe W. Poole, Thomas Porto, Charles F. Posess, Ronald C. Possell, Steven Poster, Charles and Margarita Prato, George B. Prince, Jr., Jo Ann Prince, Marsha and Kyle Pruett, M.D., Fannie R. Pruitte, Peggy L. and Richard Pschirrer, Walter K. and Christel M. Pudill, Philip M. Quartararo, Christopher J. Queram, Jeffrey Rachlin, Pearl Rachlin, Sara Rachlin, Joseph Rait, Horace G. Ramp, Francis R. Randolph, Juluru P. Rao, Lynn Reach, Phyllis D. and Anthony C. Recchia, Daniel Redmond, Sarah Reed, Kenneth M. Reichle, Jr., Harold**

**Reilly, Johanna and Anthony Rella, Herbert K. Renner, Charles H. and Leona M. Rice, Eliza L. Ridgway, Mildred M. Ritchey, Kenneth M. Robbins, Kingsley Rodrigues, Vivian L. Rodriguez, Mary Roever-Hill, Norton A. Rosenberg, Sylvia Rosenberg, Herbert Rosenstock, Jeffrey Rosensweig, Charles Rosenthal, Meril E. and Robert L. Rosenthal, Robert M. Rosin, Michael Ross, Anne Rotella, Larry Roth, Ruth Routledge, Janet B. Ruben (a/k/a Janet B. Gottlieb), Steve Rubenstein, Bernie and Ronald Rubin, Steven E. Rubin, John Ruggiero, James and Joyce Rutigliano, Herbert Sacks, Mary Saigh-Kukle, Surendra N. Samaddar, Dean M. Sanders, Diana G. Sanders, Pasquale J. Santangelo, Frank Santoro, Claire Roberts Sapaugh, Rina Sarkar, Charles P. Saulino, Paula Scaglione, Victor J. Scaravilli, David R. Scharf, D.M.D., Robert E. Scheiber, D.D.S., Fred Scheiner, Larry A. Scher, M.D., Marcia L. Scheuner, Gary S. Schleiter, M.D., Paul F. Schneider, Fred Schnitzer, Faith and Carl F. Schrader, Carole Schragis, Lee Courtney Schroder, John R. Schroer, Patricia A. Schuster (a/k/a Patricia A. Sturtevant), Andrew Schwartz, David and Jacqueline Schwartz, Harry Schwartz, Jeffrey Schwartz, Mark Schwartz, Joseph Scott, Michael Scott, Judith Seeherman, Marc Seeherman, Michael Seeherman, Miriam Seeherman, Robert Seeherman, Beverly Segal, Leonard Seltzer, M.D., James W. Serluco, Glenna M. Shaloum, Daniel J. Shapiro, M.D., Honora R. Shapiro, Abbe Shedrow, Murray Shelton, M.S. Shepard, Sylvia Shepard, Verena H. Shipkey, Herbert F. Shuler, Louise C. Siegel, Ralfe and Selma Silverman, Saul S. Silverman, Leonard Simkovitz, Harold and Julia Simonian, Nina H. Simons, Melvin Sirow, Debbie Sklar, Lawrence P. and Arliss Skule, Anne and Raymond D. Smith, Hilda V. Smith, Jane Smith, Pauline H. Smith, Stephen H. and Elane J. Sniffen, Lionel Sobel, Martin and Grace B. Soloway, Lenora Specchio, Earl V. Spielman, Fran Spike, Stewart Alan Spinks, Mark Sprague, Raymond K. and I. Jane Stafford, Frank Stanton, Raymond Staskiveg, Patricia S. Stead, Howard M. Stein, Robert D. Stephens, Jr., Jane G. Stevens, Lee D. Stevens, Paul and Diana J. Stevens, Joel A. Stone, Morris Straus, Margaret Anne Strother, Stephen**

**Sturtevant, Haken and Julie Sundell, M.D., Howard J. Synenberg, D.D.S, Hasije and Hasan Taipovic, Norman and Ruth Tankleff, Brenda J. Tate, Carroll E. Taylor, Harriet S. and John Taylor, Norman and Judith A. Taylor, Rankin Taylor, Rayetta Temple, Deborah Tenney, George Terranova, M.D., Marian Tesser, Paul P. and Shirley A. Thelen, Linda and LeRoy Thomas, Rehenne Thomas, Iris P. and R. Leon Thompson, James A. Thompson, Kenneth Thompson, Joseph Tinelli, Robert Toffler, M.D., Lester Tolleson, Rene R. Torino, Catherine Tranchida, Leslie Triffleman, Winifred M. Trimble, Lorette K. Trolle, George S. Tulloch, Moira and Wolf H. Utian, Joseph F. Vandernoot, Alice Vaught, Carol L. and Hector Vela, Doris D. Vendrell, M.D., Mercedes F. and Jose S. Villatoro, Les Vinney, Margie B. Vogel, Jozo Vujeva, David M. Walke, Eugene P. Walton, Joan D. and Thomas J. Wanderer, Janice Warner, Joseph B. Warshaw, Steven L. Wasserman, Robert and Sara Wax, Larry Waxman, Melvin Waxman, Carol Weber, Annette Weidner, Lynne Weinberg, Steven Weiner, Susan L. Weiner, Dennis Weiss, Herbert B. Weiss, Jay Weiss, Larry and Elizabeth Weiss, Brian G. Welsh, Frederick Wenzel, Beverly White, Emerson W. White, Carol White-Rapp, Suzanne S. and Haskell Whitmire, John R. Whitton, Jr., Janet L. Wickliffe, Arnold Widman, Yoash and Sharon Wiener, Glenn Wier, Phillip N. and Nancy S. Williams, Rebecca Williams, Francis B. Williamson, Jr., Susan C. Wilson, Kevin Wiltz, Richard and Dimay Winer, George Winer, George L. Wise, Barbara Witkin, Margaret Woerner, Reginald and Carreen Wondoloski, Margaret W. Wong, Roy F. Wood, Mary C. and Wesley T. Wood, Winifred S. Wood, Edgar E. Wuthrich, Betty Jo Wyatt, Catherine R. Wyatt, Duane B. Wyatt, Florence Yates, Donald G. and Ruth Young, Robert R. and Patricia L. Young, Albert Youra, George Zacek, Katharine S. Zavell, Dorothy Zebrowski, Howard Zimmerman, Oscar Zimmerman,**

**Plaintiffs,**

**-against-**

**Apollo Real Estate Advisors, L.P., Brookdale Living Communities, Inc., Winthrop Financial Associates, GFB-AS Investors, LLC, Fortress Investment Group LLC, Michael L. Ashner, Peter Braverman, R. Stanley Young and Erica Cassesso,**

**Defendants.**

**-----------------------------------------------------------------X**

Each of the plaintiffs are identified, alphabetically including his or her principal residential mailing address on Exhibit "A", annexed hereto and made a part hereof. Each and every of the plaintiffs complains of the defendants by their attorneys, Munzer & Saunders, LLP, as hereinafter set forth:

1. Plaintiffs demand a jury trial.

## JURISDICTION

2. The United States District Court for the Eastern District of New York has jurisdiction over the parties, pursuant to Title 28 of the United States Code § 1331, which provides the District Court with jurisdiction pursuant to those certain Federal Statues, 18 § U.S.C. § 1033, 18 U.S.C § 1957, 18 U.S.C. § 1962 and 18 U.S.C. § 1964, also known as the Racketeer Influenced and Corrupt Organizations Act ("RICO"). This Court also has jurisdiction over state law claims because they are so related to the RICO claims, as to form part of the same case and controversy ("Pendent Jurisdiction").

## VENUE

3. The United States District Court for the Eastern District of New York has venue pursuant to 28 U.S.C. § 1391(b), 28 U.S.C. § 1391(c) and 18 U.S.C. § 1965.

4. Defendants Winthrop Financial Associates, Michael Ashner, chief executive and Peter Braverman the operating head of GFB-AS Investors, LLC, all maintain principal offices in the Eastern District of New York, in the County of Nassau, State of New York.

## THE PARTIES

5. Each plaintiff maintains a residence at the places described on Exhibit "A".

6. At all times hereinafter mentioned and at the commencement of this action the defendant, GFB - AS Investors, LLC, ("GFB-AS"), has been a Delaware limited liability company which maintains an office for the transaction of business at 330 N. Wabash, Suite 1400, Chicago, Illinois 60611.

7. Upon information and belief and at all times herein after mentioned, defendants Michael L. Ashner, ("Ashner"), and Peter Braverman, ("Braverman"), are principal members of Winthrop and GFB-AS, and maintain their offices for the transaction of the business

hereinafter described at 2 Jericho Plaza, Jericho, New York 11753, within the Eastern District of New York.

8. Upon information and belief and at all times hereinafter mentioned, Winthrop Financial Associates, ("Winthrop"), is a limited partnership having a regional office at 2 Jericho Plaza, Jericho, New York 11753 within the Eastern District of New York; that Ashner is the managing partner of Winthrop and Braverman, its second in command.

9. Upon information and belief and at all times hereinafter mentioned, Apollo Real Estate Advisors, L.P., ("Apollo"), is a limited partnership based in New York City and owns the controlling interest in Winthrop, transacting the business hereinafter described at 60 Columbus Circle, 20th Floor, New York, New York 10023.

10. Upon information and belief and at all times herein after mentioned, defendant Fortress Investment Group LLC, ("Fortress"), is a limited liability company describing itself as a "real estate opportunity fund" having an office at 1251 Sixth Avenue, 16th Floor, New York, New York 10020 and together with Apollo, owns or controls defendant Brookdale Living Communities, Inc., ("Brookdale"), a manager of senior living properties having its principal office at 330 N. Wabash, Suite 1400, Chicago, Illinois 60611 with offices throughout the USA, including the Eastern District of New York.

10a. Upon information and belief and at all times hereinafter mentioned, defendant R.

Stanley Young, ("Young"), was the Chief Operating Officer of defendant GFB-AS having his principal office care of Brookdale at 330 N. Wabash, Suite 1400, Chicago, Illinois 60611; upon information and belief, Young is also the Executive Vice President and Chief Financial Officer and Treasurer of defendant Brookdale.

11. Erica Cassesso ("Cassesso"), upon information and belief, was employed by Winthrop at all times up to the commencement of this action, and maintains an office at 7 Bulfinch Place, Suite 500, Boston, Massachusetts 02114.

12. Each and every of the defendants are sometimes referred to collectively herein as the "Enterprise", which was partially operated at all relevant times up to including the commencement of this action from offices at 2 Jericho Plaza, Jericho, New York 11753, within the Eastern District of New York.

## INTRODUCTION

13. Grand Court Lifestyles ("GCL") was a syndicator of Senior Living Partnerships ("IPs" or "Investing Partnerships") for more than 25 years and continues to transact business in Fort Lee, New Jersey under a confirmed Plan of Liquidation (the "Plan") under the supervision of the U.S. Bankruptcy Court for the District of New Jersey ("Bankruptcy Court").

14. Each of the plaintiffs had at some point in the past, subscribed to one or more of the IPs sponsored by GCL through distinct Private Placement offerings, exempt from registration under the U.S. Securities Laws (herein sometimes referred to as the "Private Placements"). The names of each senior living facility ("SLF") included in this case are alphabetically listed on Exhibit "B" hereof.

15. Exhibit "C" hereof lists the name of each plaintiff, alphabetically, along with his/her dollar investment in one or more of the SLFs.

16. Exhibit "D" are the names, towns, and states in which the SLFs are located.

17. Each SLF was, and some still are, the 99% owner of the totality limited partnership interests in each and every of the Operating Partnerships ("OPs") listed on Exhibit "E".

18. Each of the OPs had, at the completion of the Private Placement and at all times relevant hereto, the exclusive operating control of the distinct SLF, also set forth by name and location on Exhibit "E".

19. Upon completion of the Private Placement Offering and until about February 2001, GCL designated a special purpose entity to be the General Partner of each SLF, as well as each OP.

20. The GCL General Partner entity in each case, owned, respectively, a 1% interest in each and every of the SLFs and 1% of each of the OPs.

21. The limited partners, including all of the plaintiffs herein, upon completion of the respective Private Placement did own, collectively a 99% interest, as legal owners of each SLF and, indirectly, a 98% interest in each of the OPs, wholly owned by the IP with respect thereto.

22. The stewardship of each IP, the OPs and each SLF was subject, in all respects, to the terms, covenants and conditions of certain discrete, respective limited partnership agreements, however, there is substantial uniformity of such language among the partnerships that are owned in whole or in part by the plaintiffs herein.

23. Although each and every OP is overwhelmingly owned (99%) by its IP, both the OPs and the IPs were run exclusively by the GCL-owned General Partner.

24. The plaintiffs herein are all individuals who now own, or did own up to February, 2001 one or more limited partnerships interests in one or more SLF.

25. The table on Exhibit "C" sets forth each plaintiff's subscription, in dollar terms, to each SLF included in this case. Those holdings that are still held by the plaintiffs are identified; some holdings (divided into $100k units and quarters thereof) were later sold

or assigned to others, including entities owned, or affiliated with one or more of the defendants.

26. On March 20, 2000, GCL filed a petition for Bankruptcy protection under Chapter 11 in Bankruptcy Court, in Newark, New Jersey, entitled *In re: Grand Court Lifestyles, Inc.,* Case No. 00-32578(NWL). The automatic stay applied to all of the GCL General Partners, but *not* to the SLFs or the OPs.

27. The SLFs continued to be managed under the supervision of the Bankruptcy Court until late in 2000, when the Official Committee of Unsecured Creditors decided to conduct an auction sale of the GP Corps of the IPs and the OPs under the supervision of the Court. Such auction was authorized by the Court and held.

28. The winning bidder was Enterprise member, defendant GFB-AS, who entered into that certain Purchase and Sale agreement with the debtor on December 20, 2000 and approved by order of the Bankruptcy Court on December 27, 2000. The Enterprise thus acquired ownership and control of all the OPs and IPs and the SLFs during the first four (4) months of 2001. The selling price was approximately $10 million dollars, no part of which was paid to the plaintiffs, but a $5 million dollar fund was set up under the Bankruptcy Plan to be disbursed among the 2,000 or so limited partners at the conclusion of the Plan of Liquidation. No part thereof has been distributed as of the commencement of this action.

29. The defendants entered into a management agreement for each SLF hiring one of its own wholly controlled management companies, defendant Brookdale. The agreed management fee, not to exceed 2.8%, was based upon the gross rentals received from the residents, each month, is a matter of contract between the Enterprise, the IPs, and the interested parties, including the plaintiffs herein, and so ordered by the Bankruptcy Court in its Order approving the terms of purchase and sale. The Court mandated the 2.8% management fee limitation in its approval Order.

30. The limited partners, including the plaintiffs herein, were advised of the change in General Partner ownership and control during the first six (6) months of 2001 by a mailing from defendant Winthrop.

31. Defendant Winthrop had installed defendant GFB-AS, or one of its subsidiaries as the new GP of each OP and IP. All General Partner ("GP") entities were under the exclusive control of one or more of the defendants.

32. Thus, each and every GP of each and every IP and each and every GP of each and every OP, at all relevant times, was at the commencement of this case wholly owned and controlled by the Enterprise, through various interlocking schemes.

33. In his letter mailed December 12, 2000 to interested parties in support of the Enterprise

bid, defendant Ashner, on Winthrop letterhead, described himself as "Chief Executive Officer of Winthrop Financial Associates..." stating that "historically, we [the Enterprise] have been one of the leading acquirers of distressed General Partner interests both within and without of bankruptcy court bid precesses... In each case subsequent to our acquisition we have created enhanced value for the limited partners through our skilled management, financial structuring, investment and vision." See Exhibit "F".

34. The actual consideration paid by the Enterprise to acquire the so-called GP Assets is not known, but the entirety thereof was returned to the Enterprise, upon information and belief, prior to the commencement of this action under a formula approved by the Bankruptcy Court in the approval order, pursuant to which the acquisition consideration was required to be returned to the acquirer (the "Enterprise") prior to any distributions to the limited partners either as a return on, or return of, capital. Thus, under the said approved formula the limited partners, including the plaintiffs herein, actually funded the acquisition of the GP Assets by the Enterprise, in direct proportion to each person's total equity stake in the SLFs. The approval Order effectively subordinated the limited partners' capital accounts to the Enterprise's $10 million dollar contribution. This is *not* a matter in dispute.

35. Thus, on information and belief, the entire capital investment of the Enterprise to acquire the General Partner Assets in 2001 is, at the time this action had been commenced, a grand total of *zero*.

## STATEMENT OF FACTS

36. Upon the acquisition of the General Partner Assets, as aforesaid, the Enterprise (uniformly referred to as "Apollo" during the bidding process, including the December 27, 2000 Bankruptcy Court hearing as to objections thereto), assumed each and every obligation to be performed by the respective General Partners under each of the applicable partnership agreements (OPs and IPs).

37. The obligations conferred upon the General Partner, as well as its duties and the limitations on its powers, are all but identical in each of the Investing Partnership Agreements, which are the subject of this case. By way of an example, the following provisions have been quoted from the applicable articles in the Bayswater Associates Partnership Agreements. The numbers within the quotation correspond to Article, Section and Subsection numbers in the Agreement. Upon information and belief, these quoted provisions remain unmodified and, in all respects, are still in force and effect, as of the commencement of this case.

**ARTICLE SEVEN**

**COMPENSATION OF GENERAL PARTNER**

> The General Partner shall not receive or be entitled to any fees or any other compensation from the Partnership for the services enumerated herein or for any other services.

**ARTICLE ELEVEN**

**MANAGEMENT AND CONTROL**

Section 11.1. Power and Authority of General Partner. The General Partner shall have complete and exclusive control over the management of the Partnership business and affairs..., including, without limitation, the power and authority to do all of the following which the General Partner may do at the cost, expense and risk of the Partnership...

(f) To sell, exchange, convey, trade, surrender, release, abandon, or otherwise dispose of, Partnership assets, *other than the Operating Partnership Interest, in the ordinary course of business...* (emphasis added).

(l) To delegate all or any of its duties hereunder...; provided the terms and conditions of such contracts are agreed to *through arms length negotiations and are commercially reasonable...* (emphasis added)

Section 11.3. Responsibilities of General Partner. The General Partner shall exercise prudent business judgment in managing the affairs of the Partnership.

Section 11.8. Limitations on Powers of the General Partner.

(a) Notwithstanding the powers and authority granted to the General Partner in Article Eleven hereof, the General Partner shall be prohibited from taking any actions described in the Act which general partners are *prohibited from taking without the consent of the limited partners where such action or Consent by the Additional Limited Partners has not been expressly authorized or given in this Agreement...*(emphasis added)

(b) Without the Consent of the Additional Limited partners, the General Partner shall have no authority to:

(1) do any act in contravention of this Agreement...

(3) possess the Operating Partnership Interest, or assign rights in the Operating Partnership Interest, for other than a Partnership purpose;

(7) subject to Section 5.8, Section 5.9 and Section 11.7 herein, *sell or otherwise dispose of all or substantially all of the assets of the Partnership*;...(emphasis added)

(10) subject to Section 11.7 herein, merge or consolidate

with any other entity.

Notwithstanding the foregoing, the General Partner shall have *no authority* (emphasis added) to take any action in items (5) through (10) above unless such action has been approved by a unanimous vote of the General Partner's Board of Directors.

So long as the Operating Partnership remains indebted to the Mortgagee, as defined in the Partnership Agreement of the General Partner, as amended from time to time, or any of its assignees, in connection with the acquisition of the Property, the Partnership shall have a corporate general partner having articles of incorporation containing the restrictions and terms set forth in the General Partner's Articles of Incorporation, as amended, and the Partnership shall have no other general partners.

**ARTICLE FIFTEEN**

**RECORDS, ACCOUNTING, AND RETURNS**

Section 15.2. Books and Records.

(a) The Partnership's books and records, this Agreement, and all amendments thereto shall be maintained at the principal office of the Partnership or such other place as the General Partner may determine and shall be open to *inspection and examination of the Partners* or their duly authorized representatives by appointment during regular business hours, upon three (3) business days' prior written notice. Upon written request, a Partner will be provided with the most *recent listing of Partners' names*, addresses, and capital contributions. (emphasis added).

Section 15.3. Books of Account. The General Partner will maintain or cause to be maintained accurate books of account and records of all transactions relating to the Partnership. Such books of account and other records will be *available for inspection by any Additional Limited Partner* or his duly authorized representative during regular business hours upon three (3) days' prior written notice... (emphasis added).

38. The Enterprise did communicate with the limited partners, including the plaintiffs herein, through the auspices of Winthrop, specifically its employee defendant Cassesso. Winthrop was, on information and belief, given the job within the Enterprise of "investor

relations." The mailings by Winthrop to plaintiffs instructed the plaintiffs to telephone Cassesso with any questions. Many plaintiffs followed those instructions and spoke on the telephone with Cassesso about partnership business.

39. The General Partners engaged Brookdale to manage each of the SLFs as soon as practicable after the General Partner Assets were fully acquired by the Enterprise during the first three (3) months of 2001.

40. Upon information and belief, the following described SLFs were lost to foreclosure, or otherwise involuntarily converted, during the stewardship of the Enterprise after February 1, 2001 up to and including the date this action was commenced (herein called the "Foreclosed SLFs"). The following are the locations, their IPs and estimated months and years of foreclosure.

**Foreclosed SLFs Alphabetically Listed by SLF Name**

| | SLF Name and Location (GC= Grand Court) | IP | Estimated Involuntary Conversion Date |
|---|---|---|---|
| 1 | GC Bryan, TX | Warwick Associates, L.P. | July-04 |
| 2 | GC Carrollton, GA | Wellington Manor Associates, L.P. | June-01 |
| 3 | GC Chattanooga II, TN | Dover Associates, L.P. | May-01 |
| 4 | GC Columbus, OH | Brookstone Associates, L.P. | February-03 |
| 5 | GC Denver, CO | Cumberland Associates, L.P. | October-02 |
| 6 | GC Fort Worth, TX | Nottingham Manor Associates, L.P. | May-01 |
| 7 | GC Garland, TX | Hampton Associates, L.P. | December-02 |
| 8 | GC Kansas City II, MO | Green Hills Associates, L.P. | April-02 |
| 9 | GC Las Vegas II, NV | Sandhurst Manor Associates, L.P. | April-01 |
| 10 | GC Mesa, AZ | Wembley Associates, L.P. | November-01 |

| | | | |
|---|---|---|---|
| 11 | GC Novi, MI | Western Oaks Associates, L.P. | unknown |
| 12 | GC Overland Park II, KS | Midland Manor Associates, L.P. | June-03 |
| 13 | GC San Antonio I, TX | Salisbury Associates, L.P. | May-01 |
| 14 | GC Seward, NE | Winchester Manor Associates, L.P. | July-01 |
| 15 | GC South Miami, FL | Glades Associates, L.P. | February-01 |
| 16 | GC South Shore Harbour, TX | Seaford Manor Associates, L.P. | July-01 |
| 17 | GC Westland, MI | Churchill Manor Associates, L.P. | February-04 |
| 18 | GC Winter Haven, FL | Fox Manor Associates, L.P. | April-04 |

41. Upon information and belief, defendant Brookdale, or some other Enterprise owned entity continued to act as the managing agent for an indeterminate number of Foreclosed SLFs subsequent to the effective date of the involuntary conversion of the respective SLF.

42. Upon information and belief, no oral, written or electronic notice of the said continued interest of the Enterprise in any or all of the Foreclosed SLFs was given to the limited partners who lost their investments as a result of involuntary conversion, including the plaintiffs herein designated investors in Foreclosed SLFs.

43. The terms under which the Foreclosed SLFs were transferred to the purported first lien holder(s), or the first deed of trust holder, as the case may be, were at no time disclosed to the affected limited partner owners, up to the date that this action was commenced.

44. Upon information and belief, written reports mailed to the limited partners, including the plaintiffs herein, were never signed by any executive officer of any Enterprise entity, including the GP officers.

45. That as to the SLFs which were not involuntarily converted or deeded to the first lien (trust deed) holder in lieu of foreclosure, the mailings to the limited partners reporting such events contained highly selective, misleading and deceptive information.

46. Such mailings were designed to emphasize the challenges faced by the Enterprise in managing the SLF assets, while at the same time playing down or ignoring the positive developments impacting the values during the reporting period.

47. Financial materials mailed to the limited partners were always incomplete, misleading, deceptive and sometimes false, as hereinafter described.

48. Defendants often emphasized the negative aspects of so called "demographic changes" in the municipality in which a particular SLF was located, stating that the future for this property was unpromising as a result thereof without ever saying what "demographics" they were talking about or what "changes" meant in the context of such mailings.

49. The Enterprise used the United States Mails, the telephones and other instruments of interstate commerce to frighten the limited partners about the likelihood (in the view of the Enterprise) of a particular SLF becoming insolvent, resulting in the loss of the Partnership asset, although the defendants knew, or were reckless in not knowing, that the same SLF was thriving, but for the added, unnecessary expenses charged by the Enterprise to that Partnership thereby hiding the actual net income.

50. The defendants arrogated to themselves the decision as to whether to make capital improvements to some of the SLFs, including whether or not such improvements were in the short or long term best interests of the IP and at the best prices.

51. The defendants used the United States Mails and other instruments of interstate commerce to mislead and deceive the limited partners to believe that the making of such improvements were in fact advisable and made at the lowest reasonable cost, when, in fact, such improvements were, arguably, not going to improve partnership income or value.

52. The contracts to make such improvements were, upon information and belief, not negotiated at arms length by the General Partners, in violation of the relevant partnership agreements and involved inflated payments to friendly or otherwise related companies to the Enterprise, which relationships and conflicts of interests were not disclosed to the limited partners at any time up to the filing of this case.

53. The defendants uniformly refused to answer telephonic questions from some of the plaintiffs questioning the necessity of such capital investments, the bidding processes employed, the identity of the contractors and the like.

54. The defendants had planned, upon information and belief, to worry and aggravate the

limited partners, including the plaintiffs therein, with the aim of setting the stage for the Enterprise offering to purchase the interests of the limited partners at well below the actual value at the time of that offer.

55. The said plan to scare the limited partners into selling out at cheap prices was adopted, on information and belief, the very day that the Enterprise began the bidding process to acquire the General Partner assets in the month of December 2000.

56. The plan or scheme necessitated the absolute control of information as to operations of the SLFs by the Enterprise notwithstanding the constraints it assumed (the Enterprise) under the various partnership agreements, which agreements required forthrightness and prudence in the stewardship by the General Partners.

57. The plan of the Enterprise, on information and belief, included the dissemination of false and misleading financial data by means of the instruments of interstate commerce, as aforesaid.

58. The plan or conspiracy required all members of the Enterprise to toe the so-called “party line” with respect to answering questions, oral and in writing, from the limited partners, including the plaintiffs herein.

59. Defendant Young and the other leaders of the Enterprise, with the connivance of its

underlings, including Cassesso, ordered that no detailed reports were to be mailed to the limited partners, nor would any limited partner be allowed to examine the partnership books and records, although the General Partner had expressly covenanted to *permit* such inspection and review upon reasonable notice and request therefore under all applicable documents.

60. The defendant GFB-AS took for itself fees and emoluments, as well as other expenses which were expressly forbidden by all of the Partnership agreements to be paid to or on behalf of the general partner.

61. Defendant GFB-AS and defendant Young, upon information and belief, plotted to overstate operating expenses to the limited partners and to understate the market value of the SLFs in its various reports to the limited partners in furtherance of the scheme to take over each solvent SLF outright, although the defendant GFB-AS (or its nominee/subsidiary) owned merely a 1% interest therein.

62. Upon information and belief, defendant Young, GFB-AS, and other members of the Enterprise conducted secret negotiations to sell certain SLFs to entities who promised to acquire those properties on condition that the Enterprise would continue to act as the managing agent thereof after such sale and be paid *market rate* management fees, which were about twice as high as the rate Brookdale agreed to accept to manage the SLFs for the IPs under the constraints mandated ordered by the Bankruptcy Court, as aforesaid.

63. Although the Enterprise had covenanted with the limited partners to manage the SLFs for a fee not to exceed 2.8% of the gross rents actually received, the Enterprise, upon information and belief, was not satisfied with that limitation.

64. On information and belief, the Enterprise conspired with others to obtain total ownership of the equity of the SLFs by means of secret compacts and arrangements.

65. The Enterprise during 2003, upon information and belief, employed the United States Mails to disseminate false information about the value of each SLF, claiming that an unnamed, independent appraiser had been engaged and that "in connection with that appraisal, the value" of the equity in each SLF was reported to the limited partners.

66. Upon information and belief, the Enterprise refused to name the appraiser and refused to provide a copy thereof to the plaintiffs herein, although numerous requests were made therefore, orally to Cassesso and in writing to other defendants by some of the plaintiffs.

67. One year prior to the time the Enterprise notified the limited partners of the aforesaid "valuations," the Enterprise had mailed (prior to the making of the so-called "valuations" to the limited partners), offers to pay about ½ of these values to the limited partners who, if accepted, would convey his/her interests to the Enterprise.

68. The aforesaid offers included a memorandum from an Enterprise entity emphasizing the bleak future of the relevant SLF and offering, in effect, to take the investment off his/her hand at what three (3) months later proved to be a "knock down price".

69. Upon information and belief, the only plaintiffs who accepted that offer to sell out are Barbara & Donald Abram, Flora Blumenthal, Joan M. Pawlus, and Murray Shelton.

70. The great majority of limited partners spurned the buy-out offer in the spring and summer of 2002; upon information and belief, not more than 15% in interest of the limited partners accepted such offers and sold out.

71. The Enterprise, disappointed by the poor response to its offer to buy-out the limited partners, disclosed, in the fall of 2003 that it was in preliminary discussions to sell 14 or 15 SLFs to an unnamed buyer; the Enterprise knew its name, but at no time, up to the filing of this case, did defendant Young or defendant GFB-AS disclose it to the limited partners. The unnamed buyer was Ventas Real Estate Investment Trust ("Ventas").

72. In or about the autumn of 2003, the Enterprise began offering those remaining SLFs under its stewardship for sale.

73. The decision to offer those partnership assets for sale was kept secret until a purchaser was found (Ventas), who would allow the Enterprise entity, Brookdale, to continue to

manage the SLFs sold for *market rate* management fees, a crucial fact kept from the plaintiffs. At all relevant times, defendant Young was simultaneously the CEO of the IP GPs (GFB-AS), as well as the chief financial officer of defendant Brookdale.

74. The secret negotiations included a "package deal" comprising all of the viable SLFs remaining under Enterprise stewardship at the time.

75. The Enterprise, in October 2003, decided to notify the limited partners of four (4) IPs, Victoria, Manchester, Knightsbridge, and Henley, of its plan to sell the SLFs owned by these IPs and the Enterprise did mail certain unsigned Proposals to the LPs of those four (4) IPs on October 14, 2003 (the "Proposals"), giving selective information about the proposed sale to an "unnamed" real estate investment trust.

76. The four (4) Proposals all specifically and properly acknowledged that said sales, in order to be consummated, required the consent of a majority, in interest, of the limited partners in each respective IP. The word "required" is the verb used by the Enterprise in each of the four (4) Proposals. The expressed purpose of the mailing was to solicit such consent.

77. Each Proposal solicited such consent and contained substantially similar reasons given for the recommendation to sell.

78. No Proposal referred to any other Proposal mailed that day, as if each of the four (4)

Proposals stood alone, which was clearly not the case.

79. Each Proposal was replete with false and misleading information as hereinafter described.

80. Each Proposal failed to include relevant and material information known to the Enterprise bearing heavily on the merits of each Proposal submitted to the limited partners for consideration and approval.

81. Among the deceptions in each of the four (4) Proposals, and not by way of limitation, were the following, to wit:

(a) That the so called "appraiser" of the property may not have been an independent person or company.

(b) That the appraiser's methodology evaluating the property was not disclosed or in any way discussed.

(c) That the credentials of the appraiser were not given.

(d) That the cash flow was not disclosed and depreciation allowances were buried among the expenses, as if they were cash charges.

(e) That adding back depreciation to net operating income would improve results by factors up to 100% of the results actually reported on October 14, 2003 for the years 2001, 2002 and the first 6 months of 2003;

(f) That the deal with the REIT (Ventas) had been, in fact, made by October 14, 2003 subject only to the 50.1% written approval of the limited partners.

(g) That there was sufficient net operating income in 2003 (adding back depreciation) to support the refinancing of the maturing senior debt on the four (4) SLFs owned by the IPs.

(h) That the "demographics of the area" insinuated in each Proposal was and is entirely irrelevant, inflammatory and designed to scare the limited partners into accepting the Proposal.

(i) That the Proposal at no time stated that the so called "appraiser", independent or otherwise, had issued a report concluding that the so called "appraised value" was supported in any way by data used in such a process such as comparable sales in the area, capitalization rates of net operating income, replacement cost approach and so fourth.

(j) That there was no actual claim by the Enterprise in any of the Proposals that the so-called appraisal had been in writing, much less delivered to the Enterprise in advance of the Proposals.

(k) That the negotiations with the secret REIT (Ventas) may not have been at "arms length" since the salient feature of the negotiations involved a lease-back ("Leaseback") arrangement with the REIT, as hereinafter described.

(l) That the Proposals fail to report that the recommended purchaser (Ventas) would not merely "lease" the SLF to an "affiliate of the General Partner", but actually do so on a triple net basis along with requiring a 9.25% net rental to the REIT, fee owner on the purchase price paid.

(m) That the said "affiliate" Brookdale would in fact promise a cash return to the REIT/fee owner (Ventas) of at least 9.25% of the purchase price paid above assumed debt, is

fixed rental.

(n) That in return for said net 9.25% “cash on cash” rent, Brookdale would be allowed to keep all, or substantially all income from operations above the fixed minimum rental, subject to annual inflation increases in fixed annual rent.

(o) That on information and belief, the so called “appraised value” in each of the Proposals was known by the Enterprise to be *not based* upon a standard for a free and clear sale of a fee simple interest in the SLF, but on some other undisclosed method.

82. Upon information and belief, the Proposals were all drafted, together with that certain particular transaction in mind, to wit: the sale and Leaseback transaction with Ventas, who was at the time in league with the Enterprise and who also promised to keep its arrangement with Brookdale secret from the limited partners.

83. The defendant, GFB-AS, and defendant Young, through chicanery and deceit, tried to obtain consents to the Ventas deals from the limited partners and in fact, were successful in obtaining such *uninformed* consents for three (3) out of the four (4) Proposal IPs after extending the deadlines for voting several times and after the dissemination of further misrepresentations of crucial facts to the limited partners. Defendant GFB-AS did report that the Henley investors voted “No” to the sale Proposal and, on information and belief, defendant GFB-AS retained control of Henley at the time this action was commenced.

84. In early November 2003 a group of limited partners, including a major holder, plaintiff

Lee Hartzmark, mailed certain letters to each of the limited partners of Victoria, Manchester, Knightsbridge, and Henley urging them to *decline* the Proposal of the sale to Ventas by voting "No" to the Proposal (the "LP Committee Letter"). There were two (2) versions; copies of both are attached hereto as Exhibit "G".

85. Thereafter, in response to the LP Committee Letter, the Enterprise mailed yet another unsigned letter to the limited partners who had received the original Proposals, severely criticizing the reasoning behind the LP Committee Letter and challenging the facts therein; a copy of the Victoria response letter, along with those for Henley, Manchester and Knightsbridge, ("Responses") is annexed hereto as Exhibit "H".

85a. The Responses were threatening in tone and did have the effect of frightening some of the plaintiffs into voting "FOR" the Proposal(s).

86. The Responses added nothing new in the way of factual material provided, however, they all tacitly acknowledged for the first time that adding back depreciation would, in effect, in the case of Victoria, *double* the previously forecasted cash flow for 2003. Thus, in the case of Victoria the distributable cash was actually $2 million dollars (annualized), when depreciation was properly removed in calculating net operating income (NOI).

87. Similar, although less dramatic increases in cash flow were thus forecasted for Knightsbridge, Manchester and Henley by adding back depreciation.

88. There came a time when the Enterprise reported that it had received sufficient "FOR" votes to approve the sale of SLFs owned by Knightsbridge, Manchester, and Victoria.

89. Upon information and belief, during December 2003 defendant GFB-AS and defendant Young made the decision to dispense, entirely, with its contractual duty to obtain limited partner consent for the sale of SLFs owned by the following IPs, to wit:

Sinclair
Bayswater
Windsor
Millbrook
Essex
Lubbock
Concorde
Sierra Vista
Cloverleaf

and to enter into a secret contract with Ventas to "sell out" the limited partners.

90. The Enterprise did, however, mail letters (herein referred to as "Preliminary Letters") to the limited partners of the Partnerships described in paragraph 89 hereof in effect saying that it would be a good idea to sell the SLFs and that the Enterprise was in "preliminary negotiations" to sell those SLFs to an unnamed REIT (Ventas), but no requests for consents were at any time mentioned therein.

91. That the Preliminary Letters referred to the same so-called "independent appraiser", referred to in the Proposals in regard to Victoria, Knightsbridge, Manchester and Henley

and stated that "in connection with that appraisal it was determined" that the SLF was worth a stated amount, different, of course, in each case. They did *not* say who the appraiser was, that he was disinterested, or even that the appraiser had, in fact, rendered any opinion as to value!

92. Unlike the four (4) Proposals in the Preliminary Letters, the Enterprise *did not*, at any time, say that limited partner consent was needed, or that the Enterprise would indeed, enter into a contract to sell the relevant SLF without first consulting the limited partners, when, on information and belief, such a deal had already been made with Ventas. In any case, such negotiations were far from the preliminary stage at the time the so-called Preliminary Letters were mailed.

93. Upon information and belief, there did come a time when the Enterprise did enter into contracts to sell the SLFs owned by the IPs described in paragraph 89 thereof, to Ventas, without telling any of the affected plaintiffs.

94. That upon information and belief, the fee simple titles to the SLFs owned by the IPs set forth in paragraph 89, as well as Victoria, Knightsbridge and Manchester were in fact conveyed by individual deeds in or about January and February of 2004.

95. That the limited partners, including the plaintiffs herein, were first told of the Ventas conveyance described in paragraph 93 by means of an unsigned mailing from the IPs

three (3) to five (5) months subsequent to the transfer of title had been effectuated.

96. Willfully concealed by the Enterprise from the limited partners was the fact that simultaneously with granting fee simple titles to the SLFs, the Enterprise had actually entered into net Leasebacks for each SLF property, under which Brookdale was permitted to keep *all income from operations* (rent) after paying expenses and a specified fixed net ground rental to the new fee owner, Ventas; the IPs, 99% owned by the limited partners, including the plaintiffs, were left out of the Leaseback transactions, entirely.

97. On information and belief, no facts as to the fixed net ground rental were at any time, up to the filing of this action, disclosed by the Enterprise to the respective limited partners, including the plaintiffs herein.

98. Upon information and belief, although not reported to the limited partners, including the plaintiffs herein, the net rental guaranteed to be paid to Ventas, the fee owner, was equal to 9.25% per annum of the selling price of the SLF over some undisclosed assumed debt encumbering the SLF.

99. Upon information and belief, the Enterprise mailed, in the spring 2004, along with notice of the said conveyances, checks to each of the limited partners, including the plaintiffs herein, in an amount substantially equal to the so called "appraised value" mentioned in the Proposals and the Preliminary Letters.

100. Upon information and belief, no financial reports or closing statements were given to the limited partners, including the plaintiffs herein, up to the date that this action was commenced, but that 2003 schedules K-1 were delivered in the Spring of 2004.

101. The Enterprise, in the Spring 2004, mailed notices instructing the plaintiffs to direct any inquiries to one of its employees, defendant Cassesso, who was unable or unwilling to disclose any of the sale and Leaseback details to the plaintiffs when such telephonic inquiries were made by one or more of the plaintiffs.

102. Cassesso, upon information and belief, was the designated "point person" in handling the "cover-up" of the Ventas scheme. Cassesso never, at any time, on information and belief, told any plaintiff that the secret REIT was, indeed, Ventas, although she was asked for the name, and for reasons yet unknown, the Enterprise concealed the identity of the REIT from the limited partners up to the time this case was commenced.

103. Upon information and belief, defendants Young, Ashner and Braverman, along with other Enterprise leaders, had ordered Cassesso, either orally or in writing, to keep the name of the REIT purchaser secret, as well as the fact that Brookstone had, in fact, promised a fixed minimum rent payable annually by Brookstone to Ventas. They even concealed the dollar amount of the fixed minimum ground rent required to be paid by Brookstone under each of the Leaseback leases.

104. Upon information and belief, Henley and Paradise Valley were, at the time this action was commenced, still the owners of the respective SLFs in Tampa, Florida and Phoenix, Arizona, and operated by the Enterprise, although no distributions have been paid to the limited partners.

105. At the time this action was commenced, defendant Brookdale or some other Enterprise entity did own an all encompassing Leasehold estate in those certain SLFs conveyed to Ventas in or about January and February 2004.

106. Defendant Brookdale, on information and belief, continued to act as the managing agent of all of the Ventas SLFs at the time this action was commenced.

107. At the time this action was commenced, all IPs, except Henley and Paradise Valley, had been stripped of those certain SLFs which had been owned by the corresponding IP as at February 1, 2001, before the Enterprise "took over" control of the respective SLF of each and every IP in the Bankruptcy Court approved purchase of the GCL general partner assets, as aforesaid.

108. Except as herein described, on information and belief, the Enterprise has been unable or unwilling to further account to the plaintiffs herein with respect to the subject matters of this action, even though numerous inquiries have been made of the Enterprise by some or

all of these plaintiffs herein, from time to time.

109. The Enterprise has continuously and without end, up to the filing of this action, maintained a policy of concealing the true facts of the plaintiffs' business by ordering lower level Enterprise personnel, including defendant Cassesso, to deprive the plaintiffs of all correct information as to any and all dealings with Ventas, which orders were scrupulously obeyed.

110. That the plan to divest the plaintiffs of their property was far ranging and followed a preset pattern of fraudulent misrepresentation and concealment, participated in by many members of the Enterprise, including all of the defendants, but also including unnamed lending institutions and certain of their executive officers.

**AS AND FOR A FIRST COUNT FOR CONVERSION**

111. Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs 1 through 110 of this Complaint with the same force and effect as if more fully set forth at length herein.

112. That the defendants did in the year 2003 unlawfully enter into secret contracts to convey certain properties (SLFs) to Ventas at the time owned by the plaintiffs, as limited partners without authority, express or implied, and without the consent of the plaintiffs, or any one

of them before or after such contracts were entered into.

113. Upon information and belief, the defendants, acting together pursuant to a secret scheme or plan, did convert to their own use the property of those plaintiffs who are limited partners in:

Sinclair
Bayswater
Brighton
Windsor
Millbrook
Essex
Lubbock
Concorde
Sierra Vista
Cloverleaf

by selling the SLFs owned by the plaintiffs to Ventas in January and February 2004.

114. Upon information and belief, the defendants, in concert with each other, did in January and February 2004 knowingly and illegally convert to their own use and benefit a large portion of the *sale proceeds* of those certain properties (SLFs) owned by the plaintiffs as limited partners in:

Sinclair
Bayswater
Brighton
Windsor
Millbrook
Essex
Lubbock
Concorde
Sierra Vista
Cloverleaf

115. Upon information and belief, funds received by the defendants, as proceeds of the sale of the properties (SLFs) owned by those of the plaintiffs

Sinclair
Bayswater
Brighton
Windsor
Millbrook
Essex
Lubbock
Concorde
Sierra Vista
Cloverleaf

were converted by the Enterprise, in whole or in part, to the Enterprise's own use without accounting therefore to the interested plaintiffs at any time up to the filing of this action.

116. Upon information and belief, defendants, acting together, knowingly took possession of plaintiff's money and fraudulently withheld and did convert most, if not all of those moneys and applied them to their own use and benefit.

117. That the plaintiffs who are limited partners in

Sinclair
Bayswater
Brighton
Windsor
Millbrook
Essex
Lubbock
Concorde
Sierra Vista
Cloverleaf

have been harmed and injured as a result of the defendants' willful conversion of their

assets and money.

118. By reason of the foregoing, the plaintiffs in:

Sinclair
Bayswater
Brighton
Windsor
Millbrook
Essex
Lubbock
Concorde
Sierra Vista
Cloverleaf

have been damaged to an indeterminate extent, but no less than in the sum of $100 million dollars ($100,000,000.00), that being the estimated sum of the converted funds coupled with the actual estimated value of the equity converted (SLFs) as at the commencement of this action heretofore owned by the plaintiffs before the said conversion.

## AS AND FOR A SECOND COUNT FOR COMMON LAW FRAUD

119. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 118 of this Complaint with the same force and effect as if more fully set herein.

120. Upon information and belief, each of the four (4) Proposals as hereinabove described mailed to the limited partners of Victoria, Knightsbridge, Manchester and Henley were written by defendant Young, on behalf of defendant GFB-AS on IP letterhead from the address of Brookdale in Chicago, Illinois, but unsigned by any person.

121. Each of the four (4) Proposals does state in pertinent part that the "General Partner" of the respective Partnership "...... recommends that the limited partners vote "FOR" the Proposal" (emphasis supplied).

122. Each of the four (4) Proposals was dated and mailed the same day, October 14, 2003 and each of them sought to persuade each of the respective limited partners to give up a valuable property right based upon statements and factual material contained in the Proposal which defendants Young, GFB-AS, Winthrop, Ashner, Braverman and other Enterprise members knew to be incomplete, false and materially misleading.

123. Each Proposal urged the recipient to telephone a Winthrop employee, J.T. Klette at (888) 488-5554 with any inquiries.

124. That Mr. Klette, upon information and belief, was, at all relevant times, and including the commencement of this action, an employee of Winthrop in the Boston, Massachusetts area and not in Chicago, from where the Proposals emanated.

125. Upon information and belief, Mr. Klette was, at the time the Proposal was written, a member of the Enterprise and a Winthrop employee, but not the actual executive officer of defendant GFB-AS who had directed the mailing of the Proposal to the respective limited partners.

126. The name of no person other than J.T. Klette is contained in any of the four (4) Proposals.

127. Each of the four (4) Proposals was fraudulent in at least the following specific respects, to wit:

(a) Cash flows were intentionally understated by wrongfully including depreciation as a charge against operating income, a deception which, in the case of Victoria, resulted in an under reporting of at least $1 million dollars of distributable annual cash flow and in a smaller, although less dramatic distortion in the cases of Knightsbridge, Manchester and Henley;

(b) The falsehood described in paragraph (a) above was later addressed, in subsequent letters mailed from the Enterprise, urging acceptance of the Proposals by the limited partners of Knightsbridge, Manchester and Henley, and in each of those letters, depreciation was, in fact, *added* back in new profit and loss tables, although no limited partner was ever given the option to change his previous "FOR" vote on the basis of the new figures;

(c) That no option to change votes was, at any time, given to the limited partners of Victoria, Manchester, Knightsbridge and Henley, even to those persons who had already given their consents *before* the Enterprise had increased its estimate of

distributable cash flow in each of those deals;

(d) That the person ordered by the Enterprise to draft and mail each of the Proposals knowingly lied in the assertion that there was insufficient cash flow to make *necessary* capital provements and to meet operating expenses;

(e) That the drafter lied in the respective Proposal when he said that the underlying mortgages could not be refinanced, especially with respect to Victoria which, by the Enterprise's own calculation, was worth more than $20 million dollars and required refinancing of only $13.3 million dollars, two (2) years later.

(f) That all four (4) Proposals were secretly related each to the other in that the Enterprise had a secret, although unexpressed plan to transfer all remaining SLFs as a package to one, unnamed REIT. The plan required them all to be leased back to the Enterprise, who would be allowed to keep all available income generated by the SLFs in the future, in exchange for a guaranteed minimum rental to be paid by defendant Brookdale to the transferee/lessor, who actually was Ventas, but whose identity was concealed up to the date of the commencement of this action.

(g) That all of the defendants, and especially Young, Ashner and Braverman, had devised this plan and conspired to keep the true facts thereof concealed from the recipients of each of the four (4) Proposals, including the plaintiffs herein.

(h) That defendant Cassesso, Klette and other Enterprise members, below the top level of the hierarchy, were ordered, on information and belief, by defendants Young, Ashner and Braverman to refrain from disclosing to limited partners any data not expressly included in the four (4) Proposals without prior authority to do so from senior Enterprise members.

(i) That such secrecy and orders of concealment were essential to the plan, even to the point where the Enterprise refused to honor reasonable requests, written and telephonic, by plaintiffs seeking backup financial information, limited partner lists, copies of appraisal material and the like from the defendant GFB-AS.

(j) That, in point of fact, on information and belief, there was no written appraisal by an independent appraiser and if there was anything in writing, it was not professionally prepared in accordance with industry standards, using the various valuation methods required to be used in the appraisal profession.

(k) That in point of fact, the Enterprise was careful to characterize the so-called "appraised value" not as that of a professional, by using the following careful wording to describe it such as: "in connection with this appraisal, the appraised value of the property (SLFs) was determined to be $5,900,000 (the appraised value)." The foregoing Proposal was to Manchester, but applies with varying values to the other three (3) Proposals in *haec verba*; no Proposal stated just who

was doing the "determining" (e.g., a verb without a subject). All four (4) used the exact same contorted syntax as to the so-called "appraisal."

(l) That the drafters of the Proposals, including some or all of the defendants herein, but especially defendants Young, and GFB-AS, knew that the language described in paragraph (k) above, was vague and intentionally so, in order to avoid having to disclose that the "appraisal" was unprofessional, or that, in fact, no independent third-party appraiser *had* rendered such an opinion, based upon the valuation criteria usually and customarily employed in the profession.

(m) That the "appraised values" and the data upon which they were supposedly based were false, misleading, unprofessional, and self-serving to the Enterprise and in every respect, fraudulent.

128. That the recipients of the four (4) Proposals, including the respective plaintiffs herein, did, in fact, rely upon the truth and accuracy of the Proposals and assumed, reasonably, that the four (4) Proposals included all relevant and material facts, which they did not.

129. That all of the recipients including the respective plaintiffs relied upon the truthfulness of the facts in the Proposals.

130. That the plaintiffs did rely on the expertise of defendants GFB-AS and Young in

recommending a "FOR" vote to the Proposals depending upon their professionalism, impartiality, honesty, forthrightness, prudence and competence and that defendants Young and GFB-AS wantonly abused that trust.

131. That each of the four (4) Proposals and all of them were not worthy of such reliance, although it was reasonable in every respect for the recipients of the Proposals to have placed such reliance upon them.

132. That the plaintiffs had no reason to expect that defendants Young and GFB-AS had defrauded them by concealing crucial facts needed by the recipients to make an informed decision in voting FOR or AGAINST the Proposals.

133. That the voting process was actually a sham. The real intention behind the Proposals was to get the recipients to turn over their individual property rights to the Enterprise in consideration of a deeply discounted one-time distribution promised to the recipients.

134. That all of the defendants knew, or were reckless in not knowing, that the vote was a sham in respect of the allegations contained in paragraph 132; that the Enterprise profited as a result of its fraudulent conduct in obtaining "FOR" votes in three (3) out of the four (4) IPs to which the Proposals were made, after extending deadlines several times.

135. That the scheme was finally carried out by the Enterprise when it transferred three (3)

SLFs owned by Victoria, Knightsbridge, Manchester in January and February 2004.

136. That the so-called “consents” to sell, or “FOR” votes given by some of the plaintiffs were patently and implicitly uniformed and, hence, worthless.

137. That, *ipso facto,* there has never been any authority permitting the defendants to convey title to the SLFs of Manchester, Victoria and Knightsbridge, because each and every of the so-called “consent ballots” were *de jure* and *de facto* null, void and of no legal value, whatsoever.

138. That to place the Manchester, Knightsbridge, and Victoria plaintiffs in the same position they were in before the said illegal divestiture, the value of their respective investments must be calculated as at the date this action was commenced and not earlier.

139. That damages should include interest at the highest legal rate plus the legal costs and expenses of this action, less, of course, the distributions made to the plaintiffs in 2004, as and when the first notice of the conveyance was reported to the plaintiffs by the defendants.

140. That since the conveyances to Ventas are *faits accompli,* the Enterprise must now pay money damages to the Manchester, Knightsbridge and Victoria plaintiffs, as aforesaid, restoration of the *status quo ante* being impossible; damages of $100 million dollars are

claimed.

**AS AND FOR A THIRD COUNT OR CLAIM FOR RELIEF; SUBSTANTIVE RACKETEERING 18 U.S.C. §§ 1962(c) AND 1964**

141. The plaintiffs reallege and incorporate by reference, as if set forth fully herein, the allegations contained in paragraphs 1 through 140.

142. The Enterprise has engaged, at all times up to the filing of this action, in activities, directly and indirectly, affecting interstate commerce, as defined in 18 U.S.C. § 1961. The defendants, in general and the Enterprise in particular, are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchical and consensual decision-making with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose, namely to obtain money, property and other assets from the plaintiffs and others, without authority, justification and just compensation, through numerous acts of fraudulent and otherwise criminal misconduct, including multiple acts of grand larceny and other crimes, as herein above and hereinafter described. The planning and carrying out of the defendants' scheme would be beyond the capacity of each member of the Enterprise, acting singly, or without the aid of each other.

143. Each defendant was, at all relevant times up to the commencement of this action, employed by or associated with the Enterprise in planning, as well as carrying out, the predicate acts forming the basis for the RICO claims herein described.

144. Each defendant has knowingly participated, directly or indirectly, in performing or conducting the predicate acts herein claimed alleged, through a pattern of racketeering activity consisting of numerous and repeated violations of the Federal Mail Statute, 18 U.S.C. § 1341, based upon the use of the United States Mail (a) to disseminate knowingly false and misleading information and material in order to divest the plaintiffs of their assets; (b) to conceal and otherwise cover-up their illegal activity by repeating false and misleading information by means of the mails, after completing the acts of larceny herein described; (c) each and every mailing by the Enterprise to the plaintiffs was to a degree, in furtherance of the mail fraud scheme. Every plaintiff received multiple mailings from the Enterprise during the period relevant to this action. They are too numerous to particularize, herein.

145. The defendants also used the telephone to facilitate and perpetrate the fraudulent scheme in telephone conversations with some o the plaintiffs and used facsimile machines ("Fax") for the aforesaid purposes, as more particularly described hereinafter.

March 26, 2002 - to plaintiff Rachlin, J. from defendant Cassesso - Fax

August 23, 2003 - to plaintiff Rachlin, J. from defendant Cassesso - Fax

May 27, 2004 - to plaintiff Rachlin, J. from defendant Cassesso - Fax

October 5, 2001 Conference call to Rachlin, J. and others from Winthrop functionary, John Alba.

146. The use of telephone and fax technology in furtherance of criminal activity is itself a federal crime under section 18 U.S.C. Section § 1343 (wire fraud statute).

147. The plaintiffs have suffered pecuniary loss by reason of such wire fraud and mail fraud from sustaining thereby damages in excess of $100 million dollars.

148. By reason of this injury, plaintiffs are entitled to treble damages, costs and reasonable attorneys fees pursuant to 18 U.S.C. § 1964(c), as well as such other relief that the Court deems just and proper.

## THE PREDICATE ACTS

### A. Larceny.

149. Each discrete occasion of those certain executions and deliveries of each deed to Ventas (or Ventas nominee) in 2004 by the respective OPs (which are all in turn owned 99% by the limited partners, many of whom are plaintiffs herein) was a separate and distinct act of larceny, within the meaning of New York State Penal Law § 155.

| | Investing Partnerships | Operating Partnerships |
|---|---|---|
| 1. | Bayswater Associates, L.P. | Liberty Place Associates |
| 2. | Brighton Manor Associates, L.P. | Tavares Center Associates |
| 3. | Cloverleaf Associates, L.P. I, II, III, Cloverset Valley | Cloverset Place, L.P. |
| 4. | Concorde Associates, L.P. | Brookstead Associates |
| 5. | Essex Associates, L.P. | Belleville Associates, L.P. |

| | | |
|---|---|---|
| 6. | Knightsbridge Associates, L.P. | GC - Adrian Associates |
| 7. | Lubbock Village Associates, L.P. | Cambridge Retirement Village, L.P. |
| 8. | Manchester Manor, L.P. | GC - Albuquerque Associates |
| 9. | Millbrook Hills Associates, L.P. | Springfield - Findlay Associates |
| 10. | Sierra Vista Associates, L.P. | Flamingo Vista Associates, L.P. |
| 11. | Sinclair Associates, L.P. | GC - Morristown Associates |
| 12. | Victoria Manor Associates, L.P. I,II | GC - Overland Park Associates |
| 13. | Windsor Associates, L.P. | Devon Associates, L.P. |

150. The Enterprise, along with its employees, agents, functionaries and minions, did deliberately directly order and cause a certain individual or individuals, including, but not limited to defendant Young as an official of defendant GFB-AS, to make, sign, and deliver deeds of conveyance to entities owned, controlled, or affiliated with Ventas, all of which conveyances were known by the Enterprise (and especially Young) to be without any color of authority by the IPs, more particularly its limited partners, among whom are many of the plaintiffs herein.

151. The grantors of the said deeds and the persons actually executing and delivering them on behalf of the grantors, knew that such authority was lacking and further, that such authority was required from the limited partners, in general, and the plaintiffs in particular.

152. All of the defendants were mindful of the consent requirement before, during and after the conveyances to Ventas were completed.

a. Upon information and belief, the Enterprise did produce knowingly fraudulent

documents to Ventas at the time such fee simple titles were conveyed, which documents purported to satisfy the grantees (Ventas) and their title insurer that such conveyances were proper, when the grantors knew, absolutely, that they were not.

b. Defendant Brookstone or some other Enterprise controlled entity, upon information and belief, simultaneously with the conveyances as aforesaid did, in fact, enter into leases with Ventas to Leasebacks for each and every parcel (SLF) granted.

c. Upon information and belief, defendants did not offer any of the plaintiffs an opportunity to participate in, or otherwise to retain any interest, whatsoever, in the 13 leasehold estates created by the Leaseback leases.

d. The defendants, on information and belief, did own, control and enjoy 100% of the benefits accruing from those leasehold estates, up to the filing of this case.

e. All of the defendants knew before the entry into the Leasebacks that the lessees thereunder (the Enterprise) had usurped and converted to its own use and enjoyment, to the exclusion of the plaintiffs, a valuable leasehold estate; that the grantors were aided and helped by unknown professionals, including attorneys, accountants and real estate brokers, who knew, or were reckless in not knowing,

that the Enterprise had no right to take over the fee simple estates, and had no right to lease them back from Ventas to the exclusion of the plaintiffs.

f. The Enterprise did *not* inform the plaintiffs in or about December 2003 that it had, in fact, entered into contracts of purchase and sale which ultimately culminated in the said sale and Leasebacks, keeping this crucial fact secret until well after the conveyancing and Leasebacks had been fully effectuated and recorded.

g. Upon information and belief, the Leaseback leases, or memoranda thereof, were also properly recorded with the deeds of conveyance, but the Enterprise kept that information "quiet" and did not tell the plaintiffs about the transactions until so-called "distribution checks" were mailed, months later and never, at any time, did they disclose to plaintiffs any of the terms of the Leaseback leases (e.g., parties, rent, term, additional rent, future sale and refinancing, participation and the like).

h. The sale secrets and the leasing secrets have remained such up to the filing of this case.

153. The defendants, (or some of them) received the proceeds of the Ventas sales and converted those proceeds to the use of the Enterprise without authority, express or implied.

154. At no time did the Enterprise attempt to justify to the plaintiffs, either in writing, or orally, the divestiture of plaintiffs' assets and the conversion of the proceeds to its own use.

155. The Enterprise continues to hold funds (including proceeds of the Ventas sales) belonging to the so-called Ventas plaintiffs of an indeterminate amount, claiming the right to use plaintiffs' funds to defend itself from these claims after notice of this intended action was given to them in late 2004 and in early 2005.

156. The retention of the IP assets and not distributing them to the IP limited partners is unconscionable, since all business of the IP except as pertains to this action have been wound-up, but for filing final partnership tax returns.

157. The Enterprise, on information and belief, converted to their own use, rentals received from the Foreclosed SLFs during the period that those SLFs were in default of the mortgages or deeds of trust encumbering those properties and before possession thereof was delivered to the foreclosing lender, or its assignee. The dollar amount of those converted funds are not now known, but will be the subject of discovery in this case and determined by plaintiffs' auditors.

158. Each actual event of converting those rentals was a separate and distinct predicate act within the meaning of RICO.

159. At no time up to the commencement of this action did the Enterprise account for the rentals that it received from the Foreclosed SLFs subsequent to having received notice of defaults under the applicable mortgages.

160. The plaintiffs believe that the converted rentals may come to millions of dollars.

161. The commission of each act of conversion is a larceny under New York State Penal Law § 155 and, therefore, each such act is a distinct predicate act under RICO.

162. The Enterprise has continued to hold converted funds belonging to the IPs, the true owners thereof, the limited partners, up to the date this action was commenced.

**B. <u>Mail Fraud.</u>**

163. Each distinct act of mailing fraudulent letters to the limited partners, in general and the plaintiffs in particular, are separate and distinct predicate acts of mail fraud under § 18 U.S.C. § 1341, as further described in paragraph 144 hereof.

**C. <u>Wire Fraud.</u>**

164. Each and every telephone communication between defendants and some of the plaintiffs

identified in paragraph 145 hereof was a separate and distinct violation of Section 18 U.S.C., 1343 the Wire Fraud statute, as each communication was in some way false or materially misleading and made to further the broad scheme to bilk the plaintiffs.

165. Each and every fax from Cassesso to plaintiff Jeffrey Rachlin, as described in paragraph 145 hereof was a separate and distinct act of wire fraud as each communication was in some way false or misleading in the following specific respects to it.

a) Fax March 26, 2002: The projection of 2001 results enclosed therewith underestimated income and overestimated expenses and the fax failed to communicate important data as to operations. Recipient, plaintiff Rachlin.

b) Fax February 26, 2003: The distribution check was not accompanied by important accounting information showing how the so called "excess cash" was generated; the letter failed to include such information, on information and belief, in order to keep the plaintiffs in the dark as to the results of actual operations. Recipient, plaintiff Rachlin.

c) Fax April 23, 2004: Cassesso told Rachlin of the sale of an SLF. This was the first he heard of it and no information as to how a sale was justified was given; the accounting information was broad, incomplete and incorrect and knowingly so by Cassesso; the limited partners not having the benefit of even being aware that the

property was under contract to be sold until such sale had been an accomplished fact; Cassesso says nothing of the Leaseback of the property, a crucially material and relevant omission.

d) In or about October 2001, John Alba, an Enterprise executive, originated a telephone conference call amongst some of the plaintiffs, including Jeffrey Rachlin and Marc Seeherman. During this telephone conversation Alba recommended to the listeners that the Pensacola ("Tudor") property be sold. He failed to tell Rachlin, Seeherman and the others that, in fact, as of that date the general partner had *already* agreed to sell Tudor to a known party at a known price. These omissions were more than misleading in that Alba spoke of future plans when he was reporting an accomplished fact; that SLF, owned 99% by IP Tudor Associates was, on information on belief, conveyed only six (6) weeks later on November 19, 2001. First notice of the sale was given by the Enterprise on April 11, 2002, when a check described as net proceeds on a limited partner unit basis of $5,864 was mailed. The IPs thus received 5.8 cents on their $100 thousand dollar investment.

e) Marc Seeherman received numerous faxes from defendant Cassesso as to the business and subject matter of this complaint.

166. The information disseminated by Alba as described in paragraph (d) above was known

by him to be false, misleading and designed to misinform the investors of the true facts bearing on Tudor Associates business, a classic example of using the telephone in interstate commerce, as an instrument of fraud.

**PATTERN AND CONTINUITY**

167. The predicate acts complained of in this Complaint follow a pattern of racketeering activity, to wit: embezzlement (larceny) which occurred over a four (4) period and poses a genuine probability of continuing criminal activity by the Enterprise.

168. The dozens of predicate acts hereinabove described were and are interrelated, having the same or similar purposes, to wit: the taking of money or property of the plaintiffs and those persons similarly situated; they were not each isolated events of wrongdoing. All of the predicate acts followed the same scheme: controlling all information and using the instruments of interstate commerce to aggravate the investors, setting them up for the final larcenies and finally covering their tracks with secrecy, disinformation and ignoring investors' pleas for more and better information.

169. The criminal acts alleged form a closed and open ended pattern of racketeering activity, as the Enterprise continues to hold stewardship over Henley and Paradise Valley and the prospect of continuing embezzlement following the foregoing patterns cannot be unexpected.

170. There are at least two (2) cases similar in nature *not* involving GCL or the plaintiffs herein, but both involving alleged swindling of limited partners by entities under the control of Enterprise member, defendant Apollo Real Estate Advisors, LLP.

a) *In re Nantucket Island Associates Limited Partnership Unitholders Litigation,* Civil Action Number 17379 NC, Delaware Chancery Court, New Castle County. This was a class action brought in January 2001 on behalf of limited partners against Winthrop and other defendants alleging fraudulent concealment of material facts by the defendants in furtherance of an alleged conspiracy to get the plaintiffs to give up certain valuable rights to Apollo. Apollo, as in this case, had taken over the general partner of a limited partnership and made some changes. The defendants were alleged to have lied to the plaintiffs about the true value of certain subscription rights, Apollo having allegedly used deceit to acquire those subscription rights from the class at prices way under market value. The defendants allegedly failed to disclose matters of conflicts and took advantage of the true economic facts known only to it in order to profit at the limited partners expense. It was alleged that the defendants received a $22.8 million windfall, as a result of the alleged fraud. That case was settled, well before trial in May 2003, with the defendants having paid $10 million to the plaintiff class, its exposure being $22.8 million, as aforesaid. This case differs to this action only in its scope and size. The basic methods of fraud were very similar.

b) *Zanker Group, LLP, v. Summerville, Etledgefieldville, LLC, Summerville Senior Living, Inc., Apollo Investment Funds III, and Apollo Investment Funds IV, et al.*, X06-CV-044002114S, Superior Court, Connecticut. This case brought in 2004 involves a group of limited partners suing Winthrop and Apollo for essentially the same kind of conduct alleged in this case. Although this matter is still pending, the acts complained of track the predicate acts herein above alleged in a startling way. The investments were senior living facilities and the plaintiffs were limited partners claiming to have been bilked by Apollo who purportedly fed the plaintiffs bogus information, etc.

171. Thus, plaintiffs herein allege that the business plan of acquiring so-called "distressed partnership assets" and relieving the silent investors (limited partners) of their assets has been going on for some time and, if not otherwise checked, may continue to go on in the future.

172. The key to this business plan, as annunciated by Michael Ashner in his December 12, 2000 letter, (Exhibit "F") is to control all of the information concerning these investments and to selectively release that information or mislead the investors into thinking that unless they agree to sell out "cheap", they would suffer worse losses than if they take Apollo's advice and give up their rights to Apollo, or to the secret partners of Apollo. Up until recently (Nantucket) that scheme seems to have paid off for Apollo in multiple deals, yet unknown.

173. Without acquiring the 99% equity interest in the IP, the acquisition of the GP interests made no economic sense at all. Ashner, in his letter supporting the Apollo bid in December 2000, refers to previous partnership asset purchases "in each case subsequent to our acquisition, we have created enhanced value for the limited partners through our skilled management, financial restructuring, investment and vision." What the letter does *not* state is the obvious, to wit: our investors were paid in the "dark", as it were and the new management team took for itself the real value. The acquisition of the GP Assets could yield no legitimate benefit to Apollo under the partnership agreements unless the limited partners were first to receive their entire stake back, through sale or refinancing benefits. The defendants knew this, absolutely, when the GP Assets were acquired in 2000 and simply paid no attention to their subordinated position; this was nothing new; it is what they always did in these circumstances. To pay $10 million dollars for the right to charge a 2.8% of gross rent management fee, which was what happened here, is patently ridiculous unless there was a way to "swindle" the investors out of their priority position.

174. Plaintiffs allege, therefore, that the pattern of activity was and is a series of related civil wrongs (and crimes) to be remedied by the substantive provisions of RICO.

175. Each defendant has knowingly conducted and/or participated, directly or indirectly, in the conduct of the racketeering Enterprise and directly or indirectly participated in the predicate acts herein above alleged.

176. The plaintiffs have been economically injured by reason of the defendants' conduct in that they have incurred damages in excess of $100 million dollars in the aggregate.

177. By reason of their injury, the plaintiffs are entitled to treble damages, costs, and reasonable attorneys fees pursuant to 18 U.S.C. § 1964(c) and any other relief the Court deems just and proper.

**AS AND FOR A FOURTH COUNT OR CLAIM FOR RELIEF; RACKETEERING CONSPIRACY 18 U.S.C. §§ 1962(c) AND 1964 AGAINST ALL DEFENDANTS**

178. The plaintiffs reallege and incorporate by reference paragraphs 1-177 as if more fully set forth herein.

179. The defendants have willfully combined, conspired and agreed to violate Section 18 U.S.C. § 1962(c), that is to conduct and/or participate, directly or indirectly, in the conduct of Enterprise affairs in a pattern of racketeering activity based upon the violation of New York State Penal Law § 155 (Larceny) and the implementation of the instruments of interstate commerce, to wit: the United States Mail and the use of telephone wires in order to deprive the plaintiffs of their property.

180. The object of the conspiracy was to defraud the plaintiffs and to profit at the expense of the plaintiffs through criminal activity.

181. The plaintiffs had been economically injured by reason of the defendants' conduct in that they have incurred damages in excess of $100 million dollars.

182. By reason of their injury, the plaintiffs are entitled to treble damages, costs, and reasonable attorney fees pursuant to Section 18 U.S.C § 164(c) and any other relief the Court deems just and proper.

**AS AND FOR A FIFTH COUNT OR CLAIM FOR RELIEF; BREACH OF CONTRACT 18 U.S.C. §§ 1962(c) AND 1964**

**Against defendant GFB-AS Investors LLC**

183. Plaintiffs reallege and incorporate by reference paragraphs 1 through 182 as if more fully set forth herein.

184. GFB-AS Investors LLC (or an unknown subsidiary/affiliate) failed to perform its obligations as set forth in detail hereinabove, thus having breached its partnership agreements with all of the affected limited partners, including the plaintiffs herein. The breaches are numerous and are alleged with particularity hereinabove.

185. That pursuant to the provisions of RICO, this Court may retain pendent jurisdiction over this breach of contract claim, because they are so related to the RICO claim as to form part of the same case in controversy.

186. That the plaintiffs have been injured, economically as a result of the defendants actions.

187. By reason of the foregoing, plaintiffs are entitled to damages in excess of $100 million dollars.

## AS AND FOR A SIXTH COUNT OR CLAIM FOR RELIEF; BREACH OF FIDUCIARY DUTY

188. Plaintiffs reallege and incorporate by reference paragraphs 1 through 187 as if more fully set forth herein.

189. Each IP was operated by a GP under the absolute ownership and control of defendants Young, Ashner, Braverman, Winthrop, Apollo, and GFB-AS Investors, LLC.

190. Each of the GP entities, be they limited liability companies or corporations, had direct fiduciary obligations under the terms of the respective limited partnership agreements to each and every of the limited partners, respectively.

191. The defendants named in this count did knowingly ignore the said direct responsibility to the limited partners, including the plaintiffs herein, by self-dealing, and participating, directly, in a plan to deprive the plaintiffs of something of value through trick, deceit, chicanery, and overreaching.

192. Each of the said defendants in this count knew that as fiduciaries, they each had a duty of utmost care, prudence and forthrightness.

193. Instead of acting to the standard herein above described, the defendants, nevertheless, used their position of trust to convert to their own use money, property and other assets belonging to the plaintiffs, as more particularly described herein above.

194. This is a pendent jurisdiction claim.

195. All of the plaintiffs have been injured as a result of these defendants' action.

196. By reason of the foregoing plaintiffs have been damaged in excess of $100 million dollars.

## AS AND FOR A SEVENTH COUNT OR CLAIM FOR RELIEF; UNJUST ENRICHMENT

197. Plaintiffs reallege and incorporate paragraphs 1 through 196 as if more fully set forth herein.

198. By reason of the illegal acts committed by all of the defendants, they have been unjustly

enriched in excess of $100 million dollars.

199. That defendants should disgorge and pay to the plaintiffs their ratable share of the wrongful taking of their property by the defendants.

200. This count being part of the same case in controversy, this Court should accept Pendent Jurisdiction of this state claim.

**WHEREFORE,** Plaintiffs demand judgment against the defendants as follows:

a. On the first count in the sum of $100 million dollars plus reasonable attorneys fees, together with the costs and disbursements incurred by plaintiffs in this action;

b. On the second count in the sum of $100 million dollars plus reasonable attorneys fees, together with the costs and disbursements incurred by plaintiffs in this action;

c. On the third count in the sum of $100 million dollars plus reasonable attorneys fees, together with the costs and disbursements incurred by plaintiffs in this action;

d. On the fourth count in the sum of $100 million dollars plus reasonable attorneys fees, together with the costs and disbursements incurred by plaintiffs in this action;

e. On the fifth count in the sum of $100 million dollars plus reasonable attorneys fees, together with the costs and disbursements incurred by plaintiffs in this action;

f. On the sixth count in the sum of $100 million dollars plus reasonable attorneys fees, together with the costs and disbursements incurred by plaintiffs in this action;

g. On the seventh count in the sum of $100 million dollars plus reasonable attorneys fees, together with the costs and disbursements incurred by plaintiffs in this action;

h. And for such other and further relief as this Court deems just and proper.

Dated: New York, New York
November 2, 2005

_______________________________

Stephen I. Munzer, Esq. (SM-2495)
Craig A. Saunders, Esq. (CS-0049)
Munzer & Saunders, LLP
Attorneys for Plaintiffs
609 Fifth Avenue, Suite 600
New York, New York 10017
Phone 212-755-0008
Fax 212-832-4092