UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------X

David T. Atkins, et al.,

                    Plaintiffs,                    MEMORANDUM OPINION
                                                   AND ORDER (CPS)(CLP)

     -against-                                     CV-05-4365

Apollo Real Estate Advisors, L.P.,
et al.,

                    Defendants.

-------------------------------------X
SIFTON, Senior Judge.

     Plaintiffs David T. Atkins and 695 similarly situated

plaintiffs commenced this action on September 14, 2005.  The

Third Amended Complaint, filed on March 17, 2006[1], names as

Defendants Apollo Real Estate Advisors L.P., ("Apollo"), Fortress

Investment Group LLC ("Fortress"), Brookdale Living Communities,

Inc. ("Brookdale"), Brookdale Senior Living, Inc. ("BSL"),

Winthrop Financial Associates[2] ("Winthrop"), GFB-AS Investors LLC

("GFB-AS"), Michael L. Ashner ("Ashner"), Peter Braverman

("Braverman"), R. Stanley Young ("Young"), Erica Cassesso

("Cassesso"), and fourteen entities alleged to have acted as the

---

[1] Plaintiffs filed their First Amended Complaint on November 2, 2005, adding as Defendants, Brookdale Living Communities, Inc. and R. Stanley Young. Plaintiffs filed their Second Amended Complaint on January 10, 2006. Defendants moved to dismiss the Second Amended Complaint. Thereafter, the parties agreed that Plaintiffs would withdraw certain claims from the Second Amended Complaint, and, upon Plaintiffs filing of the Third Amended Complaint, Defendants agreed to withdraw their motions to dismiss, without prejudice. After Plaintiffs filed their Third Amended Complaint on March 17, 2006, Defendants filed new motions to dismiss the Third Amended Complaint.

[2] Also known as Winthrop Realty Partners, L.P.

General Partners of limited partnerships in which Plaintiffs were
investors.[3]  Plaintiffs allege that in 2004, certain Defendants[4]
fraudulently sold 14 properties to nonparty Ventas.  Ventas then

---

[3] Plaintiffs have identified the General Partner entities in the Complaint
as The Bayswater GP Entity, The Brighton Manor GP Entity, The Cloverleaf GP
Entity, The Concorde GP Entity, The Essex GP Entity, The Knightsbridge GP Entity,
The Lubbock GP Entity, The Manchester GP Entity, The Millbrook GP Entity, The
Sierra Vista GP Entity, The Sinclair GP Entity, The Victoria Manor GP Entity, The
Waterford Shores GP Entity, and the Windsor GP Entity. Third Amended Complaint ¶
14.

Plaintiffs originally alleged that they did not know the names of the
General Partners because those names were never disclosed to them.  However,
letters sent to the limited partners concerning the potential sale of the
properties, appear to identify the General Partners for each Investing
Partnership.  Plaintiffs' counsel has confirmed Plaintiffs' good faith error in
failing to notice the names of the General Partners in those letters.  *See* Letter
from Stephen Munzer, Counsel for Plaintiffs, to Judge Sifton, dated Sept. 18, 2006
(noting, however, that the identification of the General Partners in the letters
"is the very first and only time that the designated, nominee general partners
were mentioned to any of the investors").  Because these parties could have been
identified by Plaintiffs and because it is unclear whether the General Partners
have been served with process, claims against the General Partner entities will
not be addressed here.  *See Chavez v. Nevell Mgmt. Co.*, 330 N.Y.S.2d 890 (Civ. Ct.
1972) (suggesting that plaintiff could not allege claim against defendant due to
failure to "make a genuine effort" to learn defendant's identity); *see also
Jackson v. Broadcast Music, Inc.*, No. 04-5948, 2006 WL 250524, at *1 (stating that
because defendant has not been served, he is not a party to the action).  At oral
argument, I instructed Plaintiffs that in the event they amend the complaint to
name these partnerships, they must include an explanation for the delay.  *See*
Transcript, Atkins, et al. v. Apollo Real Estate Advisors, et al., dated Nov. 3,
2006, p. 3.

Defendants are represented by counsel in two groups, the "Brookdale
Defendants" and the "Apollo/Winthrop Defendants."  The "Brookdale Defendants"
include Fortress Investment Group LLC, Brookdale Living Communities, Inc.,
Brookdale Senior Living, Inc., GFB-AS Investors LLC, and R. Stanley Young.  The
"Apollo/Winthrop Defendants" are Apollo Real Estate Advisors L.P., Winthrop
Financial Associates (now known as Winthrop Realty Partners L.P.), and Winthrop
employees Michael L. Ashner, Peter Braverman, and Erica Cassesso.  As noted above,
the General Partner entities are not currently represented among the Brookdale
Defendants or among the Apollo/Winthrop Defendants.

While it is unclear why defendants have split into two groups, one fact
that distinguishes the Apollo/Winthrop Defendants from the Brookdale Defendants is
that the Apollo/Winthrop Defendants appear to have had no ownership or control of
the senior living facilities after May 2003 and all of Plaintiffs' claims arise
out of events that took place in late 2003 and thereafter.

[4] Plaintiffs do not always identify which Defendants engaged in the
activities underlying the claims in the Third Amended Complaint.  At different
points, Plaintiffs name certain Defendants and state that those Defendants acted
together with the "Enterprise," a term apparently used to refer to all Defendants
collectively.  Plaintiffs state that they are unable to associate specific
Defendants with certain activities until full discovery has taken place.
Accordingly, I use "Defendants" or "certain Defendants" where specific actors have
not yet been identified.

leased the interests back to Defendants, allegedly depriving Plaintiffs of their interests in the leaseholds. As a result of Defendants' allegedly unlawful conduct, Plaintiffs state that they have been injured and are entitled to damages in excess of $100 million.

The Third Amended Complaint asserts nine claims for relief: (1) conversion (alleged against all Defendants), (2) common law fraud (alleged against all Defendants), (3) mail fraud under 18 U.S.C. § 1341 (alleged against Defendants GFB-AS, Young, Winthrop, Ashner, Braverman, and Cassesso), (4) wire fraud under 18 U.S.C. § 1343 (alleged against Defendants GFB-AS, Young, Ashner, and Cassesso), (5) substantive racketeering under 18 U.S.C. §§ 1962(c) and 1964 (Racketeer Influenced and Corrupt Organizations Act, "RICO") (alleged against all Defendants except BSL), (6) conspiracy under RICO (alleged against all Defendants), (7) breach of contract (alleged against GFB-AS and each General Partner), (8) breach of fiduciary duty (alleged against GFB-AS, each General Partner, and Young), and (9) unjust enrichment (alleged against all Defendants).[5]

Presently before the Court are the Brookdale Defendants' and the Apollo/Winthrop Defendants' motions to dismiss the Third

---

[5] Plaintiffs request that I assert pendent jurisdiction over the state law claims of breach of contract, breach of fiduciary duty, and unjust enrichment because the claims' relation to the RICO claim is substantial enough to form part of the same case and controversy.

For each count, Plaintiffs demand judgment in the sum of $100 million, plus reasonable attorneys' fees, costs, and disbursements incurred by Plaintiffs in this action.

Amended Complaint and Plaintiffs' cross-motion to amend the Third
Amended Complaint.  For the reasons set forth below, the
Defendants' motions to dismiss are granted and Plaintiffs' motion
for leave to amend the Complaint is granted.  Plaintiffs shall
file any amended complaint within thirty (30) days of the date of
this opinion.

**JURISDICTION**

This Court has jurisdiction over the present action pursuant
to 28 U.S.C. § 1331, which creates jurisdiction over actions
arising under federal law, specifically 18 U.S.C. § 1957, 18
U.S.C. § 1962, 18 U.S.C. § 1964 (Racketeer Influenced and Corrupt
Organizations Act, "RICO"), 18 U.S.C. § 1341 (Mail Fraud), and 18
U.S.C. § 1343 (Wire Fraud).  Jurisdiction over state law claims
which relate to actions over which this Court has original
jurisdiction, may lie under the Court's supplemental
jurisdiction.

**BACKGROUND**

The following facts are drawn from the complaint and the
parties' submissions in connection with the motions.  On
considering the motions to dismiss, all well pleaded facts
alleged in the complaint are viewed in the light most favorable
to Plaintiffs.  *See Patel v. Searles*, 305 F.3d 130, 135 (2d Cir.

2002). However, allegations contradicted by documents submitted with the complaint or incorporated by reference in the pleadings are not accepted as true. *See Matusovsky v. Merrill Lynch*, 186 F.Supp.2d 397, 400 (S.D.N.Y. Feb. 15, 2002); *2 Broadway LLC v. Credit Suisse Boston Mortgage Capital LLC*, No. 00-5773, 2001 WL 410074, at *9 (S.D.N.Y. Apr. 20, 2001).

<u>The Parties</u>

The 696 plaintiffs in this action were investors in one or more of 14 limited partnerships ("Investing Partnerships"), which in turn owned interests in Operating Partnerships that owned senior living facilities. Each Investing Partnership was managed and partly owned by a General Partner. Plaintiffs reside in more than 25 states, including New York.

Nonparty Grand Court Lifestyles, Inc. ("Grand Court") syndicated the Investing Partnerships and served as, owned, or was an affiliate of the General Partner of each Investing and Operating Partnership.

Defendant Fortress has a controlling stock interest in Defendant BSL and its principal place of business is in New York City. Fortress owned a controlling interest in Brookdale Living Communities, Inc. ("Brookdale") up until November 2005, when shares of BSL, which owned Brookdale, were distributed to the public in an initial public offering.

BSL is a public company with offices nationwide. It is a

holding company formed in June 2005 to acquire 100% of the assets of Defendant Brookdale.  In May 2003, Brookdale purchased 45% of Defendant GFB-AS from Defendants Winthrop, Ashner, and Braverman, giving Brookdale 100% ownership of GFB-AS.

Defendant GFB-AS is a Delaware company owning 100% of each of the General Partners of the 14 Investing Partnerships. Defendant R. Stanley Young ("Young") is the Vice President and Chief Operating Officer of GFB-AS.  Young is also the Executive Vice President, Chief Financial Officer, and Treasurer of Defendants BSL and Brookdale.

Defendant Apollo is a limited partnership entity based in New York City, which makes debt and equity investments in real estate including the acquisition of interests in limited partnerships.

Apollo controlled Defendant Winthrop, a limited partnership that provides investor relations services to real estate limited partnerships and provided such services in connection with the senior living facilities involved in this litigation.  Its services include the handling of correspondence and answering telephone queries from investors regarding the limited partnerships.  Defendant Ashner is Chief Executive Officer ("CEO") of Winthrop; Defendant Braverman is Winthrop's Executive Vice President; and Defendant Cassesso is a Winthrop employee in Boston who assists with investor relations communications and

holds the title "Senior Analyst." TAC ¶ 12. Apollo and Ashner were members of GFB-AS at the time Grand Court sold its interests to GFB-AS in a February 2001 bankruptcy sale. They sold their interests in GFB-AS in May 2003.

Structure of the Grand Court Investments

Each of the 14 Investing Partnerships sponsored by nonparty Grand Court had exclusive operating control of a senior living facility. Limited partners (including entities that are not plaintiffs in this action) owned 99% of each of the 14 Investing Partnerships sponsored by Grand Court. General Partners affiliated with Grand Court owned the remaining one percent interest in each Investing Partnership and a one percent interest in the Operating Partnership associated with each Investing Partnership. Plaintiffs therefore owned a 99% interest in the Investing Partnership and a 98% interest in the Operating Partnership. Under the limited partnership agreement governing each Investing Partnership, the General Partner ran the day-to-day operations of each Investing Partnership, Operating Partnership, and senior living facility.

Events Leading up to the Current Action

*Sale of Grand Court's General Partner Entities*

On March 20, 2000, Grand Court, the company that originally syndicated the Investing Partnerships, filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the

District of New Jersey.  In late 2000, under the Bankruptcy
Court's supervision, Grand Court decided to auction the General
Partner entities controlling the Investing and Operating
Partnerships.  On December 27, 2000, the Bankruptcy Court
approved the sale of Grand Court's General Partner interests to
Defendant GFB-AS, giving GFB-AS effective control of all the
Investing and Operating Partnerships, as well as of the senior
living facilities.  Plaintiffs allege that while the actual
consideration paid to acquire the Grand Court assets is unknown,
the selling price was approximately $10 million.  The limited
partners' capital accounts were effectively "subordinated" to the
amount contributed by Defendants.  None of the $10 million paid
was distributed to Plaintiffs despite the Bankruptcy Plan's
creation of a $5 million fund to be disbursed among the
approximately 2,000 limited partners as part of the Plan of
Liquidation.

General Partners from Grand Court or Grand Court affiliates
were replaced with new General Partners, who assumed the General
Partners' obligations under the limited partnership agreements.
All General Partner entities were under the control of Defendant
GFB-AS.  GFB-AS retained Brookdale to run the day-to-day
operations of the senior living facilities.  GFB-AS and the
Investing Partnerships agreed upon, and the Bankruptcy Court
approved, a management fee of 2.8% of the gross monthly rentals

received from the residents.  In early 2001, through an unsigned

mailing, Defendant Winthrop notified the limited partners,

including Plaintiffs, of the change in general partnership

ownership.  Winthrop instructed the limited partners to telephone

Defendant Cassesso if they had questions.

*Duties and Obligations of General Partners*

The duties and obligations of all General Partners for each

Investing Partnership are governed by an Investing Partnership

Agreement.  Article Seven of this agreement prohibits General

Partners from receiving fees or other compensation from the

Partnership.  Section 11.1 (under Article 11) provides that

General Partners

> shall have complete and exclusive control over the
> management of the Partnership business and affairs . . . ,
> including, without limitation the power and authority . . .
>
> . . . .
>
> (f) To sell, . . . or otherwise dispose of, Partnership
> assets, other than the Operating Partnership Interest, in
> the ordinary course of business . . .
>
> . . . .
>
> (l) To delegate all or any of its duties hereunder . . . ;
> provided the terms and conditions of such contracts are
> agreed to through arms length negotiations and are
> commercially reasonable . . . .

Section 11.8 limits the powers of the General Partner, providing

that

> (a) Notwithstanding the powers and authority granted to the
> General Partner in Article Eleven hereof, the General
> Partner shall be prohibited from taking any actions

described in the Act which general partners are prohibited from taking without the consent of the limited partners where such action or Consent by the Additional Limited Partners has not been expressly authorized or given in this Agreement . . . .

(b) Without the Consent of the Additional Limited partners, the General Partner shall have no authority to:

. . . .

(b)(3) possess the Operating Partnership Interest, or assign rights in the Operating Partnership, for other than a Partnership purpose;

. . . .

(b)(7) subject to Section 5.8, Section 5.9 and Section 11.7 herein, sell or otherwise dispose of all or substantially all of the assets of the Partnership;

Regarding records and accounting, Article 15 provides that

"[t]he Partnership's books and records, this Agreement, and all amendments . . . shall be open to inspection and examination of the Partners or their duly authorized representatives . . . . Upon written request, a Partner will be provided with the most recent listing of Partners' names, addresses, and capital contributions."

Investing Partnership Agreement, § 15.2. Under Section 15.3, the General Partner's "books of account and other records will be available for inspection by any Additional Limited Partner or his duly authorized representative . . . ."

*Offers to Buy the Limited Partners' Interests*

At some point in 2001, Defendants offered to buy the limited partners' interests, but none of the limited partners responded to the offer. In 2002, Defendants mailed a letter to Plaintiffs stating that an independent appraiser had determined a value for

the interests that was twice as much as the 2001 offer to purchase the interests. Defendants did not respond to the limited partners' oral and written requests to name the appraiser. Expressing doubt about the financial viability of the senior living facilities, Defendants offered again to purchase the limited partners' investments. Five limited partners agreed to sell while the majority of limited partners rejected the offer.

On May 29, 2003, Defendants Ashner, the CEO of Winthrop, and Apollo sold their interests in GFB-AS to Brookdale, giving Brookdale complete ownership of GFB-AS and thus full control over each Investing and Operating Partnership. Brookdale's control remained subject to the terms of each partnership agreement, and Brookdale became the manager of each senior living facility. Fortress in turn owned and controlled Brookdale. Thus, Plaintiffs contend, each General Partner of each Investment Partnership and of each Operating Partnership was wholly owned and controlled by Brookdale and Fortress. Plaintiffs allege that they did not receive notice of this change in ownership.

*First Sale to Ventas: Victoria, Manchester, and Knightsbridge*

In Fall 2003, certain of the Defendants informed the limited partners that the Defendants were in preliminary discussions to sell 14 or 15 senior living facilities to an unnamed buyer. Nonparty Ventas Real Estate Investment Trust ("Ventas"), a public

company, was according to Plaintiffs the unnamed buyer.
Defendants offered to sell to Ventas the senior living facilities
and by extension the partnership assets.

In October 2003, certain Defendants informed the limited
partners of three Investing Partnerships - Victoria, Manchester,
and Knightsbridge – of their plan to sell the senior living
facilities owned by these partnerships.  The proposals to sell
the facilities stated that the plan required the consent of the
majority of limited partners.  According to Plaintiffs, the
proposals lacked essential information.  Each proposal did not
mention two other proposals to sell the relevant Investing
Partnership.  Defendants also did not disclose to the limited
partners that Ventas had agreed to allow Brookdale to continue to
manage the properties for market rate management fees (twice as
high as the management fee approved by the Bankruptcy Court in
2000), nor did they disclose that Defendant Young was both the
CEO of Defendant GFB-AS and Chief Financial Officer of Defendant
Brookdale.  No information was provided about the appraiser, his
identity, the methodology to be employed, the appraiser's
credentials, and whether the appraisal would be in writing.
Other financial details, such as cash flow, depreciation
allowances, and the benefits of adding depreciation to net
operating income either lacked explanation or were not revealed.
Plaintiffs allege that allusions to the changing "demographics of

the area" were made as a reason to sell even though population changes were actually benefitting the properties.  The proposals also did not mention that the purchaser would lease the senior living facility to an affiliate of the General Partner and would be required to do so on a triple net basis.  Moreover, limited partners were not informed that under the proposed Sale and Leaseback transaction with Ventas, the General Partner affiliate (Brookdale) would guarantee to the new owner (Ventas) a cash return of at least 9.25% of the purchase price paid above assumed debt, as a fixed rental.  In return, Brookdale would keep nearly all income from operations above the fixed minimum rental.

In early November 2003, a group of limited partners called the "Limited Partners Committee" mailed undated letters to each limited partner of the Investing Partnerships known as Henley, Victoria, Manchester, and Knightsbridge.  They wrote that they believed "that the value in these partnerships are [sic] substantially higher than the dollars being offered," that "the financial information provided in the solicitation is very misleading," and requested that the limited partners vote "no" to the proposals.  The Limited Partners Committee sent another similar letter dated November 21, 2003, "strongly advis[ing]" the limited partners with interests in Henley, Victoria, Manchester, and Knightsbridge to "DECLINE the sale" for several reasons, and expressed concern that the proposed sale of the limited partners'

interests was improper.[6]  In early 2004, after extending the
voting period, Defendants obtained the necessary votes to sell
the senior living facilities owned by the Victoria, Manchester,
and Knightsbridge partnerships to Ventas.

*Second Sale to Ventas: Remaining Investing Partnerships*

With respect to the remaining Investing Partnerships
(Bayswater, Brighton Manor, Cloverleaf, Concorde, Essex, Lubbock,
Millbrook, Sierra Vista, Sinclair, Waterford Shores, and
Windsor)[7], Defendants GFB-AS, Young, and the General Partners
sent Preliminary Letters to the limited partners informing them
that Defendants were in negotiations to sell the senior living
facilities to an unnamed buyer, again Ventas.

---

[6] In its November 21, 2003 letter, the Limited Partners Committee listed the
following reasons for voting no to the sale:

1. We believe the value of these partnerships is substantially higher
   than the dollars being offered.
2. There has been a substantial amount of net operating income in the
   past, as well as since receipt of the 2002 financial statement.
3. There have been no distributions sent to the limited partners this
   fall, as promised earlier in the year.
4. There is a good possibility that the properties can be refinanced.
5. As you can see the new solicitation breaks out the depreciation,
   which shows a substantial cash flow, which was previously omitted.
6. There has been no disclosure of the REIT [Real Estate Investment
   Trust], which is purchasing the properties.

The Committee further urged those partners who had previously voted yes to change
their vote to no, thus indicating that their previous vote could be nullified.

[7] Plaintiffs claim to list the senior living facilities whose Investing
Partnerships were sold in the Third Amended Complaint in paragraph 82, but they do
not list Brighton Manor.  I note that Plaintiffs also include as an exhibit a
Preliminary Letter addressed to "the Limited Partners of Brighton Manor
Associates."  Neither party has submitted a Preliminary Letter addressed to the
Limited Partners of Sinclair, though Plaintiffs have listed Sinclair in the
complaint.  Drawing all inferences in favor of Plaintiffs, the non-moving party, I
include Brighton Manor and Sinclair in the list of senior living facilities sold
to Ventas here so as to be consistent with Plaintiffs' representation that the
total number of Investing Partnerships sold was 14.

According to Plaintiffs, these letters also lacked essential information. Unlike the earlier proposals, the consent requirement under the Investing Partnership Agreement was not mentioned, nor was consent requested. The letter stated that an appraisal had taken place, but no information was provided concerning the appraiser or his methods.

In January or February 2004, certain Defendants conveyed to Ventas fee simple titles to the senior living facilities owned by the Bayswater, Brighton Manor, Cloverleaf, Concorde, Essex, Lubbock, Millbrook, Sierra Vista, Sinclair, Waterford Shores, and Windsor Investing Partnerships. The limited partners, including Plaintiffs, were informed of the conveyances three to five months after the transfer of title. The limited partners were not informed that at the same time, Defendant Brookdale entered into a Master Lease for each senior living facility property. The lease allowed Brookdale or its nominated affiliate, to keep all income from operations after paying expenses and a fixed rent to Ventas, the new fee owner. That guaranteed rent was again equal to 9.25% per annum of the selling price of the senior living facility, over undisclosed assumed debt. As with the previous three proposals to sell, the Investing Partnerships, of which the limited partners had owned 99%, were excluded from these leaseback agreements.

In addition to sending notice of the conveyances in mid-

2004, certain Defendants also mailed to the limited partners checks equal to the appraised value of each investment. Defendants instructed the limited partners to direct inquiries to Defendant Cassesso of Winthrop, but Plaintiffs state that Cassesso refused to disclose to Plaintiffs the sale and leaseback terms or the name of the buyer despite repeated telephone calls from Plaintiffs. At the time of BSL's initial public offering in November 2005, the Master Lease information became available pursuant to BSL's obligations under federal securities laws to disclose that information to the public.

*Litigation*

On September 14, 2005, Plaintiffs filed their complaint against Apollo, Winthrop, GFB-AS, Fortress, Michael Ashner, Peter Braverman, and Erica Cassesso. Plaintiffs amended their complaint three times with the consent of Defendants, adding as Defendants Brookdale Living Communities, Inc., Brookdale Senior Living, Inc., Young, and fourteen general partner entities.

In these complaints, Plaintiffs alleged that Defendants provided incomplete or misleading information in order to persuade the limited partners, including Plaintiffs, to sell their interests in the Investing Partnerships to Defendants at a price far below the interests' actual value. Plaintiffs allege that Defendants Young (Vice President and COO of GFB-AS), Ashner, Braverman, and Cassesso (all three of Winthrop) agreed, in

violation of the Investing Partnership Agreement, not to mail
detailed reports to limited partners and to prohibit limited
partners from examining partnership books and records.
Defendants Young and GFB-AS, Plaintiffs allege, sought to
overstate operating expenses and understate the market value of
the senior living facilities in order to trick Plaintiffs into
selling their interests in the Investing Partnerships.
Plaintiffs claim that Defendants planned to sell senior living
facilities to other entities on condition that Defendants would
continue to act as managing agent and be paid market rate
management fees, approximately twice as high as the management
fee approved by the Bankruptcy Court.

Presently before the Court are the Brookdale Defendants' and
the Apollo Defendants' motions to dismiss Plaintiffs' Third
Amended Complaint with prejudice pursuant to Federal Rules of
Civil Procedure 12(b)(6), 9(b), and 8(a).  Plaintiffs' have made
a cross-motion for leave to amend the Third Amended Complaint "to
the extent that this Court determines that plaintiffs have not
adequately plead either their RICO or fraud counts against the
defendants."  Plaintiffs' Memorandum of Law in Opposition to
Defendants' Motions to Dismiss the Third Amended Complaint, p.
29.  For the reasons set forth below, Defendants' motions to
dismiss are granted in part and denied in part, and Plaintiffs
are granted leave to file an amended complaint within thirty (30)

days of the date of this decision.


**DISCUSSION**

Pleading Standards

*Rule 12(b)*

Defendants seek dismissal of plaintiff's complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

In considering a motion pursuant to Rule 12(b)(6), a court should construe the complaint liberally, "drawing all reasonable inferences in the plaintiff's favor," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (citing *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001)), although "mere conclusions of law or unwarranted deductions" need not be accepted. *First Nationwide Bank v. Helt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994). Indeed, conclusory allegations "will not suffice to prevent a motion to dismiss." *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002). On a motion to dismiss, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995).

Nevertheless, to survive a 12(b)(6) motion to dismiss, the allegations in the complaint must meet the standard of

"plausibility." *See Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955,
1970 (2007).  Although the complaint need not provide "detailed
factual allegations," *id.* at 1964; *see also ATSI Commc'ns v.
Shaar Fund, Ltd.*, 493 F.3d 87, 98 n. 2 (2d Cir. 2007)(applying
the standard of plausibility outside *Twombly*'s anti-trust
context), it must "amplify a claim with some factual allegations
. . . to render the claim plausible." *Iqbal v. Hasty*, 490 F.3d
143, 157-158 (2d Cir. 2007) (emphasis in original) (holding that
the plaintiff's complaint adequately alleged the personal
involvement of the Attorney General because it was plausible that
officials of the Department of Justice would be aware of policies
concerning individuals arrested after 9/11).  The test is no
longer whether there is "no set of facts" that plaintiff could
prove "which would entitle him to relief." *Bell Atlantic*, 127
S.Ct. at 1969 (quoting *Conley v. Gibson*, 355 U.S. 45-46 (1957))
("[t]he phrase is best forgotten as an incomplete, negative gloss
on an accepted pleading standard").  Rather, the complaint must
provide "the grounds upon which [the plaintiff's] claim rests
through factual allegations sufficient 'to raise a right to
relief above the speculative level.'"  *ATSI Commc'ns*, 493 F.3d at
98 (quoting *Bell Atlantic*, 127 S.Ct. at 1965).

*Rule 9(b)*

Defendants also argue that Plaintiffs' fraud claims should
be dismissed because each fails to plead fraud with the

particularity required by Federal Rule of Civil Procedure 9(b).

Rule 9(b) provides that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of the mind of a person may be averred generally." The rule is "intended to ensure that each defendant is provided with reasonable detail concerning the nature of his particular involvement in the alleged fraud." *The Equitable Life Assurance Society v. Alexander Grant & Co.*, 627 F.Supp. 1023, 1028 (S.D.N.Y.1985). Accordingly, in a fraud allegation the plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993). "[T]he acid test is whether the allegations satisfy the primary concern behind Rule 9(b), which is that defendants are put on notice of what they are accused of, so that they are reasonably able to respond and mount a defense." *Vaughn v. Consumer Home Mortgage, Inc.*, 2003 WL 21241669, *4 (E.D.N.Y.2003) (*citing Union Carbide Corp. v. Montell N.V.*, 944 F.Supp. 1119 (S.D.N.Y.1996)).

However, a "[p]laintiff need not plead dates, times and places with absolute precision, so long as the complaint gives 'fair and reasonable notice to defendants of the claim and the

grounds upon which it is based.'" *Goldin Associates, L.L.C. v. Donaldson, Lufkin & Jenrette Securities Corp.*, 2003 WL 22218643, *7 (S.D.N.Y.2003)(*citing Int'l Motor Sports Group, Inc., v. Gordon*, 1999 WL 619633 *3 (S.D.N.Y. 1991).  Thus, rule 9(b) "does not require that a complaint plead fraud with the detail of a desk calendar or a street map." *Gelles v. TDA Indus., Inc.*, 1991 WL 39673, *6 (S.D.N.Y.1991).  "Indeed, in analyzing the sufficiency of a pleading under Rule 9(b), a district court must balance the rule with both Fed.R.Civ.P. 8(a) which requires only a 'short and plain statement' of the claims for relief and Fed.R.Civ.P. 8(f), which provides that 'all pleadings shall be so construed as to do substantial justice.'" *Goldin Associates*, 2003 WL 22218643, at *7 (S.D.N.Y.2003) (citations omitted); Wright & Miller, § 1298 at 10565.

Because allegations of fraud must be pled with particularity, fraud pleadings generally cannot be based upon information and belief. *Segal v. Gordon*, 467 F.2d 602, 608 (2d Cir.1972).  "There is a recognized exception to this rule, however, that fraud allegations may be so alleged as to facts peculiarly within the opposing party's knowledge, in which event the allegations must be accompanied by a statement of the facts upon which the belief is based." *DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987)(collecting cases).  While Rule 9(b) permits conditions

of mind to be averred generally, the rule also requires that
allegations of intent to defraud be supported by facts giving
rise to a "strong inference" of fraudulent intent. *Ouaknine v.
MacFarlane*, 897 F.2d 75, 80 (2d Cir.1990); *Beck v. Manufacturers
Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir.1987); *Connecticut
National Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir. 1987).

Furthermore, in cases involving multiple defendants, Rule
9(b) requires that the pleading identify the nature of each
defendant's participation in the alleged fraud. *DiVittorio v.
Equidyne Extractive Industries*, 822 F.2d 1242, 1247 (2d Cir.
1987); *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986).

*Rule 8(a)*

The Brookdale Defendants also argue that Plaintiffs' breach
of contract claim against GFB-AS does not meet the basic
requirements of Rule 8(a) of the Federal Rules of Civil
Procedure, which provides that a pleading setting forth a claim
for relief "shall contain . . . a short and plain statement of
the claim showing that the pleader is entitled to relief." Fed.
R. Civ. P. 8(a).

Defendants' Motions to Dismiss[8]

Both the Brookdale and Apollo/Winthrop Defendants argue that

---

[8] The Apollo/Winthrop Defendants state that they adopt by reference and
incorporate in their own submissions the Brookdale Defendants' memorandum in
support of the Brookdale Defendants' motion to dismiss. Apollo/Winthrop
Defendants' Memorandum in Support of their Motion to Dismiss the Third Amended
Complaint, p. 1. Defendants' arguments are accordingly analyzed together.

Plaintiffs' claims against certain parent corporations should be dismissed because the Third Amended Complaint makes no specific allegations against them.[9]  Defendants also argue that Plaintiffs' RICO claims fail as a matter of law.  Defendants assert that Plaintiffs (1) fail adequately to plead two predicate acts by each defendant, (2) fail to plead mail and wire fraud with adequate particularity, and (3) fail to allege properly the existence of a RICO enterprise.  Defendants further contend that Plaintiffs do not have standing to sue for violations of the federal mail and wire fraud statutes.  As for Plaintiffs' state claims, Defendants argue that the Court should not exercise supplemental jurisdiction over those claims because they do not state a claim for relief.

*Alleged Liability of Fortress, BSL, and Apollo*

The Brookdale Defendants (which include Fortress, Brookdale, BSL, GFB-AS, and R. Stanley Young) seek dismissal of all allegations against Fortress and BSL and the Apollo/Winthrop defendants (which include Apollo, Winthrop, and Winthrop employees Ashner, Braverman, and Cassesso) seek dismissal of all claims against Apollo on the basis that the Third Amended Complaint does not allege specific acts or conduct by either and because those corporations' mere ownership in other defendants

---

[9] The Brookdale Defendants seek dismissal of all allegations against Fortress and BSL and the Apollo/Winthrop Defendants seek dismissal of all claims against Apollo.

cannot subject Fortress, BSL, and Apollo to liability.

It is well-established that "a corporate relationship alone is not sufficient to bind a parent corporation for the actions of its subsidiary." *DeJesus v. Sears Roebuck & Co. Inc.*, 87 F.3d 65, 69 (2d Cir. 1996) (quoting *Thomson-CFS, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 777 (2d Cir. 1995). "Ownership by a parent of all its subsidiary's stock" is "insufficient to disregard distinct corporate entities. Actual domination, rather than the opportunity to exercise control, must be shown." *Williams v. McAllister Bros. Inc.*, 534 F.2d 19, 21 (2d Cir.1976). "To overcome the presumption of separateness afforded to related corporations, Plaintiffs must come forward with the showing of actual domination required to pierce the corporate veil." *Id.* (quoting *Williams*, 534 F.2d at 21)(internal citations and quotations omitted).

Plaintiffs appear to name Fortress, BSL, and Apollo as defendants solely because of their corporate relationships to other defendants. Plaintiffs assert that Fortress effectively "owned everything" after Brookdale entered into the leaseback arrangement with Ventas, Third Amended Complaint ¶ 89, and that Fortress "continues to control Brookdale through its control of the Board of Directors of the Brookdale parent, [BSL]." TAC ¶ 36. Brookdale in turn owns GFB-AS. Regarding Apollo, plaintiffs state that Apollo, "at all times relevant up to the filing of

this action controlled Winthrop Financial Associates, a defendant herein." Third Amended Complaint ¶ 6; *see also* Third Amended Complaint ¶ 37. Plaintiffs do not support the allegations against Fortress, BSL, or Apollo with specific facts concerning these corporations' or their employees' wrongdoing. Plaintiffs also do not show that either Fortress or BSL actually dominated Brookdale or GFB-AS.[10] Plaintiffs do not even name Apollo in their state law claims or in connection with the predicate acts underlying their RICO claims against Apollo. Accordingly, because the Third Amended Complaint does not allege facts from which I may infer that Fortress or BSL dominated other defendants or that Fortress, BSL, and Apollo acted on their own behalf to defraud plaintiffs, plaintiffs claims against Fortress, BSL, and Apollo are dismissed. *See DeJesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996) (dismissing claims against defendants because plaintiff did not show that defendants dominated subsidiaries or directly engaged in fraud and stating that a "[c]omplaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)") (quoting *Palda v. General Dynamics Corp.*, 47 F.3d 872, 875 (7th Cir. 1995) (internal quotations omitted); *Grossman v. Citrus Assoc's of New York Cotton Exchange, Inc.*, 706 F.Supp.

---

[10] Moreover, Brookdale Senior Living's registration statement demonstrates that the majority of BSL's board is unaffiliated with Fortress. BSL's Registration Statement under the Securities Act of 1933, pp. 131-134, Hirsch Decl. Tab 1.

221, 229 (S.D.N.Y. 1989)(conclusory allegations of participation

in a fraudulent scheme will not withstand a Rule 12(b)(6)

motion).

*Plaintiffs' RICO Claims*

Plaintiffs' allege their RICO claim for substantive

racketeering pursuant to 18 U.S.C. § 1962(c), which provides that

> [i]t shall be unlawful for any person employed by or
> associated with any enterprise engaged in, or the activities
> which affect, interstate or foreign commerce, to conduct or
> participate, directly or indirectly, in the conduct of such
> enterprise's affairs through a pattern of racketeering
> activity or collection of unlawful debt.

Pursuant to 18 U.S.C § 1964(c), which provides for civil remedies

under RICO, Plaintiffs seek treble damages, costs, and attorneys'

fees.

To establish a RICO claim, a plaintiff must meet two

pleading burdens.  First, he must allege that the defendant has

violated the substantive RICO statute, 18 U.S.C. § 1962.  *AIU*

*Insurance Co. v. Olmecs Medical Supply, Inc.*, No. 04-2934, 2005

WL 3710370, at *6 (E.D.N.Y. Feb. 22, 2005) (citing Moss *v. Morgan*

*Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1983)).  Second, the

plaintiff must invoke the civil remedies of treble damages,

costs, and attorneys' fees by alleging that he was "injured in

his business or property by reason of a violation of section

1962."  *Moss,* 719 F.2d at 17.  There is no dispute that

Plaintiffs have satisfied the second burden.  The question is

whether they have met the first.

To meet the first burden, the plaintiff must allege (1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce. *AIU Insurance Co. v. Olmecs Medical Supply, Inc.*, No. 04-2934, 2005 WL 3710370, at *6 (E.D.N.Y. 2005)(citing Moss *v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1983). *Accord Davis Lee Pharmacy, Inc. v. Manhattan Central Capital Corp.*, 327 F.Supp.2d 159, 163 (E.D.N.Y. 2004); *Leung v. Law*, 387 F.Supp.2d 105, 113 (E.D.N.Y. 2005). When bringing a RICO claim against multiple defendants, the plaintiff must allege that each defendant committed two or more predicate acts. *See, e.g., DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001) (stating that "the requirements of Section 1962(c) must be established as to each individual defendant" and that "at least two predicate acts must be present to constitute a pattern"); *Citadel Mgmt. Inc. v. Telesis Trust, Inc.*, 123 F.Supp.2d 133, 155 (S.D.N.Y. Nov. 20, 2000) ("In the context of a RICO claim, each defendant must be alleged to have engaged in two or more predicate acts."). Plaintiff must show that "the predicate acts are related and that they amount to, or pose a threat of, continuing criminal activity." *AIU Insurance Co.*,

2005 WL 3710370, at * 9 (internal citations omitted).  "Predicate acts are related if they have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."  *Id* (quoting *Davis Lee Pharmacy, Inc. v. Manhattan Central Capital Corp.*, 327 F.Supp.2d 159, 164 (E.D.N.Y. Jul. 15, 2004)) (internal quotations and citations omitted).

The terms enterprise, racketeering activity, and pattern as used in the RICO statute are terms of art.  An "enterprise" is a legal entity or an association-in-fact.  *See* 18 U.S.C. § 1961(4). "Racketeering activity" includes any act indictable under the state and federal criminal statutes specifically listed in 18 U.S.C. § 1961(1), including, relevant to this action, the mail fraud statute, 18 U.S.C. § 1341, and the wire fraud statute, 18 U.S.C. § 1343.[11]  A "pattern" of racketeering activity involves at least two predicate acts meeting the definition of racketeering activity.  *See* 18 U.S.C. § 1961(5).

Defendants argue that Plaintiffs' RICO claims fail as a matter of law because (1) they do not adequately plead at least two predicate acts by each defendant, (2) do not plead mail and

---

[11] The elements of mail and wire fraud are: (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) the use of the mails or wires to further the scheme.  *See Lopresti v. Merson*, No. 00-4255, 2001 WL 1132051, at *12, n.7 (S.D.N.Y. Sept. 21, 2001) (citing *Schnell v. Conseco, Inc.*, 43 F.Supp.2d 438, 443 (S.D.N.Y. Mar. 31, 1999).

wire fraud with adequate particularity, and (3) fail to allege the existence of a RICO enterprise. They also contend that Plaintiffs have not adequately alleged the elements of a RICO conspiracy, in particular that Plaintiffs do not allege facts showing that each defendant entered into an agreement to commit two or more predicate acts. I consider each of these arguments in turn.

1) Two Predicate Acts by Each Defendant

The Brookdale Defendants argue that plaintiffs have not alleged any predicate acts committed by Brookdale.[12]

Plaintiffs assert that the predicate acts that constituted the pattern of racketeering activity involved numerous instances of mail and wire fraud in order to persuade the plaintiffs to sell their interests in the Investing Partnerships to defendants at a price far below the interests' actual value. Plaintiffs' mail fraud claim is alleged against defendants Young, GFB-AS, each of the General Partner entities, Winthrop, Cassesso, Ashner, and Braverman. Plaintiffs' wire fraud claim is limited to defendants Young, GFB-AS, Ashner, and Cassesso. Because defendant Brookdale is not alleged to have been involved in the

---

[12] The Brookdale Defendants also state that Plaintiffs have not alleged predicate acts committed by Fortress or BSL. The Apollo/Winthrop Defendants argue that Plaintiffs have not alleged any predicate act committed by Apollo. Because I have already dismissed claims against Fortress, BSL, and Apollo, I need not address this argument in relation to those Defendants. In any event, the same reasoning that I apply here to Brookdale would apply to Fortress, BSL, and Apollo.

alleged predicate acts of mail or wire fraud, Plaintiffs' RICO
claim under 18 U.S.C. § 1962(c) as to defendant Brookdale is
dismissed. *See First Interregional Advisors Corp. v. Wolff*, 956
F.Supp. 480, 485 (S.D.N.Y. Feb. 21, 1997) (dismissing RICO claim
because plaintiff did not properly allege mail or wire fraud
against defendants named under RICO claim and stating that "while
[plaintiff] does allege that the RICO enterprise was carried on
by all defendants, general conclusory allegations such as this
are insufficient under Rule 9(b) [of the Federal Rules of Civil
Procedure"), *cited in Lopresti v. Merson*, No. 00-4255, 2001 WL
1132051, at *15 (S.D.N.Y. Sept. 21, 2001); *Morin v. Trupin*, 747
F.Supp. 1051, 1065 (S.D.N.Y. Sept. 20, 1990) (dismissing RICO
claim because plaintiff did not clearly connect defendants with
predicate acts and stating that through "such undifferentiated
pleading, plaintiffs neglect that the focus of section 1962(c) is
on the individual patterns of racketeering engaged in by a
defendant, rather than the collective activities of the members
of the enterprise"). However, Plaintiffs' RICO claim is
dismissed without prejudice as to its renewal against Brookdale
because I cannot determine at this time whether Plaintiffs could
plead sufficient facts concerning predicate acts to support such
claims against that defendant. *See Lopresti*, 2001 WL 1132051, at

*15.[13]  Indeed, sufficient factual information may only emerge in
the course of discovery.  *See AIU Insurance Co. v. Olmecs Medical
Supply, Inc.*, No. 04-2934, 2005 WL 3710370, at *8 (E.D.N.Y. Feb.
22, 2005) (stating that "where the role of the particular
defendant in the RICO enterprise is unclear, plaintiffs may well
be entitled to take discovery on this question")' *Friedman v.
Hartmann*, No. 91-1523, 1994 WL 376058, at *2 (S.D.N.Y. July 15,
1994) (finding that because plaintiff did not have "the benefit
of access to an extensive paper trail in framing its complaint,"
plaintiff was entitled to discovery concerning defendants' role
in alleged RICO enterprise).

2) Rule 9(b)'s Particularity Requirement for Mail and Wire Fraud
Allegations

Defendants argue that Plaintiffs' fraud allegations fail to
meet the heightened pleading requirements of Federal Rule of
Civil Procedure Rule 9(b).

A. Mail Fraud

Plaintiffs' mail fraud allegations relate to two sets of

---

[13] Plaintiffs allege in their Opposition to Defendants' Motions to Dismiss
that Brookdale and Apollo may have some connection to the predicate acts of mail
fraud in that they knew or could have foreseen that the mailings were used to
further the alleged scheme.  *See* Plaintiffs' Opposition to Defendants' Motion to
Dismiss, pp. 19, 21.  Plaintiffs cite *In re Sumitomo Copper Litig.*, 995 F.Supp.
451, (S.D.N.Y. 1998), which states that the mail and wire fraud statutes require
in part that the
     plaintiff show (1) that the defendants "caused" the mailing or use of the
     wires, . . . that they must have acted with knowledge that the use of the
     mails (or wires) will follow in the ordinary course of business, or where
     such use can reasonably be foreseen, even though not actually intended, and
     (2) that the mailing or use of the wires was for the purpose of executing
     the scheme or . . . incidental to an essential part of the scheme.
*Sumitomo*, 995 F.Supp. at 455 (internal quotations and citations omitted).

documents: (1) the Proposals mailed to Plaintiffs seeking the limited partners' consent to the sale of senior living facilities named Knightsbridge, Manchester, and Victoria, and (2) the Preliminary Letters advising the limited partners of 11 Investing Partnerships that the General Partners were in preliminary discussions concerning the sale of the senior living facilities associated with those eleven partnerships.

1. *The Proposals*

Regarding the Proposals, plaintiffs allege that "each of the three [] Proposals . . . mailed to the limited partners of Victoria, Knightsbridge, and Manchester were written by defendant Young, on behalf of defendant GFB-AS on [Investment Partnership] letterhead from the address of [defendant] Brookdale in Chicago, Illinois, but unsigned by any person." TAC ¶ 111. "[T]here is no indication who ordered them to be mailed, but each of them referred [] recipients [] to employees of Winthrop if there are [sic] any questions." TAC ¶ 135. Plaintiffs further state that

> [i]t is not currently known which of the GFB-AS managers and which of the defendant Winthrop officers gave the orders, but on information and belief, defendant Cassesso was not acting on her own. Employees of Winthrop, defendant Cassesso and Mr. Klett, referred to in the Proposals, were . . . reporting to defendants Ashner and Braverman, who were executive officers of Winthrop. Winthrop had been engaged by defendants Young and Brookdale to take care of obtaining consent to the sale by a sufficient number of limited partners.

*Id.*[14]   The Proposals were sent out in October 2003.

Plaintiffs allege that the Proposals were fraudulent, specifically that the Proposals omitted or mischaracterized essential information in an attempt to mislead the limited partners into giving up their interests.  Specifically, each proposal did not mention the other two Proposals to sell the respective Investing Partnership.  Plaintiffs contend that the Proposals contained improper computations of "cash flow" and "net income;" that the Proposals' reference to "the demographics of the area" constituted a "scare tactic" with racist undertones; that the Proposals provided no information concerning the appraisal of each partnership's value, such as the appraiser's identity or the methodology employed; and that "[n]one of the Proposals disclosed the conflicts of interest among the General Partners and the [Investing Partnerships] as relates to the sale and Leaseback of these deals to Ventas as part of a package deal."  *See generally* TAC ¶ 136.

Plaintiffs fail to meet the stringent pleading requirements of a RICO claim because they do not *explain* how the Proposals were fraudulent.  Plaintiffs do not explain why each Proposal

---

[14] In their letter to the Court dated November 17, 2006, Plaintiffs invoke the "group pleading doctrine" in connections with the mail fraud allegations. That doctrine provides that "[i]n cases of corporate fraud where the false and misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other group published information, it is reasonable to presume that these are the collective actions of the officers." *Degulis v. LXR Biotechnology, Inc.*, 928 F.Supp. 1301, 1311 (S.D.N.Y. 1996).

should have mentioned that a similar Proposal had been sent to the limited partners of two other partnerships. Plaintiffs do not state the basis for their assertion that the "the letters were untrue in the assertion that three (3) deals lacked sufficient "cash flow" to meet operating expenses . . . ." TAC ¶ 135(ii). Plaintiffs state without explaining that "depreciation is an irrelevant charge in computing 'cash flow.'" TAC ¶ 135(iv). Plaintiffs' assertions concerning the alleged appraiser, as well as their contention that the Proposals' reference to changing demographics constituted a "scare tactic," are conclusory.[15] Finally, regarding conflicts of interest, the Proposals expressly state that

> [i]t is expected that in connection with the sale of the Property to the [Real Estate Investment Trust or REIT], the REIT will, in turn, triple net lease the Property to an affiliate of Brookdale to operate the Property. Pursuant to such a lease, in exchange for rental payments, the affiliate of Brookdale will be responsible for all costs associated with the Property and will retain all income, if any, generated by the Property.

Knightsbridge, Manchester, and Victoria Proposals, p. 4 (Hirsch Declaration, Tab 5). Accordingly, even under a relaxed pleading standard[16], plaintiffs' allegations concerning the Proposals have

---

[15] Given that the properties at issue concerned senior living facilities, one could logically conclude that any reference to changing demographics related to the age (rather than the race) reflected in the communities around the properties. *See also* Brookdale Memorandum, p. 28 (suggesting that the term "demographics" in this context related solely to the age of the populace).

[16] At this stage of the litigation, and because the Proposals and Preliminary Letters are unsigned, plaintiff cannot know or specify which individual or entity was behind each alleged act of fraud. Accordingly, it is

not met the pleading requirements of a RICO claim. *See In Re Allied Capital Corp. Securities Litigation*, 2003 WL 1964184, at *4 (S.D.N.Y. 2003) ("[T]he Complaint establishes nothing more than that the plaintiffs disagree with [defendant's] investment valuations – but . . . alleging disagreement with some of [defendant's] valuations does not equate to alleging fraud.") (internal citations omitted); *Chill v. General Electric Co.*, 101 F.3d 263, 267 (2d Cir. 1997)(plaintiffs do not have "license to base claims of fraud on speculation and conclusory allegations"); *see also Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990) (exception to Rule 9(b) allowing allegations based on information and belief must not be mistaken for license to base claims of fraud on speculation and conclusory allegations").

2. *The Preliminary Letters*

The Preliminary Letters dated December 11, 2003 were sent to the limited partners of eleven other partnerships, specifically Bayswater, Brighton Manor, Cloverleaf, Concorde, Essex, Lubbock, Millbrook, Sierra Vista, Sinclair, Waterford Shores, and Windsor. Plaintiffs allege that the Preliminary Letters were "prepared by or on behalf of defendant Young with the help of employees of

---

appropriate for this Court to relax the requirement that a specific speaker be identified for each act. *See Shapo v. Engle,* 1999 WL 1045086, at *13(N.D.Ill. 1999) ("[W]here the named defendants are corporate insiders or control the actions of an entity" the requirement that the specific defendants who performed each act be identified "may be relaxed, especially when the defendants are in a better position to know the extent of each defendant's participation in the complained conduct."); *see also DiVittorio v. Equidyne Extractive Indus. Inc.,* 822 F.2d 1242, 1247 (2d Cir. 1987).

defendant Brookdale and employees of defendant Winthrop, on limited partnership letterhead and unsigned by anyone." TAC ¶ 139. Plaintiffs further allege that "[a]ll of the Preliminary Letters contained materially false and misleading statements designed to deceive the recipients into 'going along' with the secret sale of the SLFs to Ventas." TAC ¶ 138. Specifically, Plaintiffs state that the letters "failed to disclose the conflict of interest between the limited partnerships and the respective general partner . . . as well as Brookdale, since no mention was made of the package deal with Ventas." TAC ¶ 142(a). Plaintiffs state the appraisal was a "sham," TAC ¶ 142(b), and suggest that the letters are misleading because they do not define "cash flow." Unlike the Proposals, the Preliminary Letters do not mention the need to obtain the vote of approval of the majority of the limited partners.

Plaintiffs' allegations with respect to the Preliminary Letters are largely conclusory, speculative, and contradicted by the evidence. Plaintiffs state the defendants did not disclose alleged "conflicts of interest," but the Preliminary Letters convey that "[t]he General Partner has begun preliminary negotiations with unaffiliated publicly traded real estate investment trusts ('REIT') to sell the REIT property," Preliminary Letter, p. 1 (Hirsch Declaration, Tab 6), and goes on to describe the likely financial arrangements between the REIT

and a potential Brookdale affiliate following the sale of the property to the REIT.[17]  Plaintiffs do not explain how the appraisal was a "sham," nor do they explain how the failure to define "cash flow" in the Preliminary Letters is fraudulent. Finally, plaintiffs' allegations concerning the Preliminary Letters' failure to mention the consent requirement do not sound in fraud.  Construing the facts in the light most favorable to Plaintiffs, Section 11.8 of the Investing Partnership Agreements appears to limit the power of the General Partner to "sell or otherwise dispose of all or substantially all of the assets of the Partnership" without the consent of the limited partners. *See* Investing Partnership Agreement, § 11.8(a)-(b).  Plaintiffs' essentially allege that certain defendants sold Plaintiffs' interests without requesting or obtaining Plaintiffs' consent. Plaintiffs, as parties to the Investing Partnership Agreements and sophisticated investors, were either aware of or in a position to learn about the consent requirement.  Therefore, the failure to mention or obtain the limited partners' consent in the Preliminary Letters is not properly characterized as fraudulent.

---

[17]    The Preliminary Letters state that

it is expected that in connection with the sale of the Property to the REIT, the REIT may, in turn, triple net lease the Property to a third party provider, which may be an affiliate of Brookdale.  Pursuant to such lease, in exchange for rental payments, the third party provider will be responsible for all costs associated with the Property and will retain all income generated by the Property.

Preliminary Letter, p. 1 (Hirsch Declaration, Tab 6).

Accordingly, plaintiffs' allegations concerning the Preliminary Letters do not meet the pleading requirements of a RICO claim.[18]

## B. Wire Fraud

Plaintiffs identify six communications (three facsimiles and three telephone calls) in support of their allegations of wire fraud as RICO predicate acts. Plaintiffs allege that these communications were made by defendants Young and Cassesso. Plaintiffs also state that Cassesso was the "spokesperson for GFB-AS," Plaintiffs' Opposition Memorandum, p. 16, and that she acted under orders from Young, Ashner, and Braverman." TAC ¶ 96.[19]

### 1. *Faxes*

Plaintiffs' conclusory allegations concerning the facsimiles cannot meet the pleading requirements of Rule 9(b). Specifically, Plaintiffs do not explain why the "Miscellaneous

---

[18] I therefore need not address Defendants' arguments that Plaintiffs' mail fraud allegations must be dismissed because Plaintiffs fail to show reasonable reliance on the Preliminary Letters. *See* Brookdale Memorandum, pp. 29, 32. *See Bank of China v. NBM LLC*, 359 F.3d 171, 178 (2d Cir. 2004) ("[I]n order to prevail in a civil RICO action predicated on any type of fraud . . . the plaintiff must establish 'reasonable reliance' on the defendants' purported misrepresentations or omissions."). Plaintiffs do not plead reliance in the Third Amended Complaint, but have subsequently sought to do so following a request by the Court at oral argument. *See* Letter of Stephen Munzer to Judge Sifton dated November 17, 2006. I expect that Plaintiffs will plead reliance in any subsequent amendment to the Third Amended Complaint.

[19] The Apollo/Winthrop Defendants argue that Cassesso cannot be subject to a RICO claim because she was a "low level employee," who did not "participate in the operation or management of the enterprise itself." Apollo/Winthrop Defendants' Memorandum, p. 14 (citing *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)). Plaintiffs identify Cassesso as a "Senior Analyst" in charge of "investor relations." *E.g.*, TAC ¶ 42. Construing the facts in the light most favorable to Plaintiffs, the non-moving party, I cannot dismiss Plaintiffs' claims against Cassesso on the basis put forth by the Apollo/Winthrop Defendants.

Administrative Charges" listed in the March 26, 2002 fax were "improper charges to income," nor do they show how Cassesso would have known that such charges were improper. *See* TAC ¶ 154(a). Plaintiffs provide no basis for the assertion that "Cassesso's fax dated February 26, 2003 . . . knowingly contained fake administrative charges . . . , the aim being to make it look like operational results were worse than they truly were." TAC ¶ 154(b). Similarly, no explanation is given for the allegation that Cassesso, in an April 23, 2004 fax, "failed to provide any information as to how the sale [of a property] was justified . . . although the true facts thereof were known to Cassesso at the time . . . ." TAC ¶ 154(c). Accordingly, plaintiffs cannot construe these facsimiles as predicate acts of wire fraud. *See, e.g., Rombach v. Chang*, 355 F.3d 164, 175 (2d Cir. 2004) ("To meet the pleading requirement of Rule 9(b), plaintiffs cannot rest on their say-so that these statements are fraudulent; they must explain why. Having neglected to do so, they fail to plead with the requisite particularity.").

## 2. *Telephone Calls*

The Preliminary Letters instructed the limited partners to contact defendant Erica Cassesso if they had any questions concerning the contents of the letters.[20] Plaintiffs allege that

---

[20] The Proposals instructed the limited partners to contact J.T. Klette, who is not a party to this action. *See* Knightsbridge, Manchester, and Victoria Proposals, p. 7 (Hirsch Declaration, Tab 5).

Cassesso refused to provide information to Plaintiffs who called with inquiries about the proposed sale. Towards the end of 2003, Plaintiffs state that Cassesso informed Norman Bard, a plaintiff who contacted Cassesso, that she "was the only person with whom Norman Bard can speak and that she refused to give Young's telephone number to Norman Bard." TAC ¶ 154(d). Plaintiffs further allege that Cassesso "never gave out any information which would satisfy plaintiffs' concerns, such as 'Send me the appraisal report'; 'What rent is reserved under the Net Lease you spoke about?'; 'What is the cash flow from my property?'; and so forth. . . . Furthermore, [she] never referred the caller to a more knowledgeable person." Plaintiff's Opposition Memorandum, p. 22.

Plaintiffs also allege that while GFB-AS personnel stated that only defendant Young could answer questions regarding the REIT transactions, defendant Young could rarely be reached by telephone. In one telephone conversation in December 2003, defendant Young stated that after reviewing the Investing Partnership Agreements, he believed that the limited partners' consent was not required to sell the properties that corresponded to the partnerships named in the Preliminary Letters. TAC ¶ 154(g). A GFB-AS representative allegedly told a nonparty limited partner that the appraisal and "a copy of the investor list could be sent to Zimmerman only if he signed a

confidentiality agreement prohibiting him from sharing it with his counsel." TAC ¶ 154(I). Taken together, Plaintiff's allegations concerning these phone calls, including the assertions that defendant Cassesso was not forthcoming with essential information and that defendant Young was substantially unavailable to respond to inquiries brought by limited partners, are sufficient to put certain defendants[21] on notice of the charge that they fraudulently concealed information from Plaintiffs, information to which Plaintiffs were apparently entitled under the Investing Partnership Agreements.

3) RICO Enterprise

To bring a successful RICO claim, a plaintiff must allege the existence of an enterprise, which is distinct from the alleged racketeering activity. *United States v. Turkette*, 452 U.S. 576, 583 (1981) ("The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages."). Under 18 U.S.C. § 1961(4), a RICO 'enterprise' is defined as "any . . . group of

---

[21] Plaintiffs allege that Cassesso engaged in wire fraud when she "knowingly used the telephone to communicate orders she presumably received from her bosses, defendants Ashner and Braverman, as well as defendant Young." TAC ¶ 155. In their discussion of wire fraud, Plaintiffs also allege that GFB-AS personnel refused to discuss the REIT transactions. Because Plaintiffs state that the wire fraud claims are brought against defendants Young, GFB-AS, Ashner, and Cassesso, TAC ¶ 150, I do not consider wire fraud allegations made or suggested against defendants Braverman or Winthrop. Accordingly, the RICO claims against those defendants, including the RICO conspiracy claims, are dismissed. *See Lakonia Management Ltd. v. Meriwether*, 106 F.Supp.2d 540, 557 (S.D.N.Y. 2000) ("[W]here a RICO conspiracy claim is based upon predicate acts that have been dismissed by the court, the conspiracy claim must be dismissed as well.").

individuals associated in fact although not a legal entity."
The existence of an enterprise "is proved by evidence of an
ongoing organization, formal or informal, and by evidence that
the various associates function as a continuing unit." *Id. See
also First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d
159, 174 (2d Cir. 2004) ("The Amended Complaint fails, however,
to detail any *course* of fraudulent or illegal conduct separate
and distinct from the alleged predicate racketeering acts
themselves – a requirement in this Circuit.") (emphasis in
original).  The enterprise element of RICO is to be construed
liberally.  *See In Re Sumitomo Copper Litigation*, 995 F.Supp.
451, 454 (S.D.N.Y. 1998).

In this case, Plaintiffs fail to distinguish an enterprise
from the alleged predicate acts of mail and wire fraud.
Plaintiffs allege that the "common purpose" of the defendants in
the enterprise was "to obtain money, property and other assets
from the plaintiffs and others, without authority, justification
and just compensation, through numerous acts of fraudulent and
otherwise criminal misconduct, including multiple acts of mail
fraud, wire fraud and other crimes . . . ."  TAC ¶ 157.  Case law
holds that "in a fraud-based RICO claim, if the sole purpose of
the alleged enterprise is to perpetrate the alleged fraud, there
can be no enterprise for RICO purposes." *Goldfine v. Sichenzia*,
118 F.Supp.2d 392, 401 (S.D.N.Y. 2000) (citation omitted); *see*

*also First Capital Asset Management*, 385 F.3d at 175 (stating that "Plaintiffs' 'conclusory naming of a string of entities does not adequately allege an enterprise' and further stating that "Plaintiffs have failed to provide us with any solid information regarding the 'hierarchy, organization, or activities' of this alleged association-in-fact enterprise, from which we could fairly conclude that its 'members functioned as a unit'") (citations omitted). Accordingly, Plaintiffs' substantive RICO claims against all Defendants are dismissed.

4) RICO Conspiracy Claim

Similarly, Plaintiffs have failed to allege a RICO conspiracy claim, which requires a plaintiff to "prove an agreement by each defendant to commit at least two or more predicate acts." *Davis Lee Pharmacy, Inc. v. Manhattan Central Capital Corp.*, 327 F.Supp.2d 159, 163 (E.D.N.Y. 2004) (citing *Hecht v. Commerce Clearing House*, *Inc.*, 897 F.2d 21, 25 (2d Cir. 1990)). Plaintiffs conclusorily state that "[t]he defendants have willfully combined, conspired and agreed to violate [] 18 U.S.C. § 1962(c)," TAC ¶ 176, but does not allege a "factual basis for a finding of a conscious agreement between the parties." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 26 n. 4 (2d Cir. 1990). Accordingly, Plaintiffs' RICO conspiracy claim is dismissed.

*Standing under Federal Mail and Wire Fraud Statutes*

Plaintiffs do not contest the Brookdale Defendants' argument that Plaintiffs do not have standing to bring independent causes of action under the federal mail and wire fraud statutes. Here the law is clear. A private party may not bring an action under a criminal statute unless the statute specifically authorizes a private right of action. *See Vasile v. Dean Witter Reynolds, Inc.*, 20 F.Supp.2d 465, 477 (E.D.N.Y. 1998); *Thompson v. Thompson*, 484 U.S. 174, 179 (1988). Because the federal mail and wire fraud statutes do not create a private right of action, counts three and four of the Third Amended Complaint are dismissed with prejudice. *See, e.g., Vasile*, 20 F.Supp.2d at 478 (stating that plaintiff could not bring an action alleging mail or wire fraud "because these respective statutes do not create a private right of action"); *In re Integrated Res., Inc. Real Estate Ltd. Partnerships Securities Litigation*, 851 F.Supp. 556, 567 (S.D.N.Y. April 28, 1994)(dismissing claims for alleged violations of federal wire and mail fraud statutes "because there s no private right of action under the wire and mail fraud statutes"); *Official Publications, Inc. v. Kable News Co.*, 884 F.2d 664, 667 (2d Cir. 1989).

*Supplemental Jurisdiction over State Law Claims*

Because I have dismissed Plaintiffs' federal RICO claims, I decline to exercise jurisdiction over the state law claims. *See Monaco v. Stone*, 2002 WL 32984617, at *29 (E.D.N.Y. 2002)

(declining to exercise jurisdiction over state law claims after having dismissed federal law claims because there was no reason to depart from the general rule that "where the federal claims are dismissed before trial, the state claims should be dismissed as well.") (citing *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994); *see also United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.").

*Leave to Amend*

Rule 15(a) of the Federal Rules of Civil Procedure provides in relevant part that

> a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.  A party shall plead in response to an amended pleading within the time remaining for response to the original pleading or within 10 days after service of the amended pleading, whichever period may be the longer, unless the court otherwise orders.

"The district court has discretion whether or not to grant leave to amend."  *Lutin v. New Jersey Steel Corp.*, 122 F.3d 1056, 9 (2d Cir. 1997) (citing *Azurite Corp. v. Amster & Co.*, 52 F.3d 15, 19 (2d Cir. 1995)).  "When a cause of action is dismissed because of a pleading deficiency, a plaintiff is generally permitted to replead, unless repleading would be futile."  *In Re Gilat Satellite Networks, Ltd.*, 2005 WL 2277476, at *26 (E.D.N.Y. 2005) (citing *In Re AOL Time Warner, Inc. Securities and "ERISA"*

*Litigation*, 381 F.Supp.2d 192 (S.D.N.Y. 2004)). In addition, "[c]omplaints dismissed due to a failure to comply with the pleading requirements of Rule 9(b) are almost always dismissed with leave to amend." *Id.* Defendants contend that Plaintiffs motion for leave to amend should be denied because Plaintiffs have already amended their complaint twice[22] and because any further amendment would be futile. *See* Apollo/Winthrop Defendants' Memorandum, p. 16; Brookdale Defendants' Reply Memorandum, p. 22. Since I remain unconvinced that any further amendment would be fruitless, Plaintiffs' motion for leave to amend the Third Amended Complaint is granted. Plaintiffs shall file their amended complaint in a manner consistent with this opinion within thirty (30) days of the issuance of this opinion.

## CONCLUSION

For the reasons stated above, the Brookdale Defendants' motion to dismiss is granted. The Apollo/Winthrop Defendants' motion to dismiss is also granted. Plaintiffs' motion for leave to amend the Third Amended Complaint is granted, and they are directed to file their amended complaint consistent with this opinion within thirty (30) days of the issuance of this opinion.

The Clerk is directed to transmit a copy of the within to

---

[22] As noted above, Plaintiffs first amendment to the Complaint involved the replacement of one plaintiff's name with another. After Defendants moved to dismiss the Second Amended Complaint, the parties agreed that Plaintiffs would withdraw certain claims from the Second Amended Complaint, and, upon Plaintiffs filing of the Third Amended Complaint, Defendants motions to dismiss would be deemed withdrawn without prejudice.

all parties and to the Magistrate Judge.

SO ORDERED.

Dated: Brooklyn, NY
       April 30, 2008

                By:     /s/ Charles P. Sifton (electronically signed)
                                United States District Judge